No. 2013-1635, -1671

## United States Court of Appeals
## For the Federal Circuit

AVIVA SPORTS, INC.,

*Plaintiff-Cross-Appellant,*

v.

FINGERHUT DIRECT MARKETING, INC.,
MENARD, INC., and KMART CORPORATION,

*Defendants,*

And

MANLEY TOYS, LTD.
(doing business as Manley Toys and ToyQuest),

*Defendant-Appellant.*

*Appeal from the United States District Court for the District of Minnesota
in Case No. 09-CV-1091, Judge Joan N. Ericksen*

## [CORRECTED] BRIEF OF APPELLEE CROSS-APPELLANT
## AVIVA SPORTS, INC. IN OPPOSITION TO APPELLANT'S BRIEF

DORSEY & WHITNEY LLP
J. Thomas Vitt, Esq.
David Y. Trevor, Esq.
Michael Weinbeck, Esq.
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

*Counsel for Plaintiff-Cross-Appellant*

i

# <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellee/Cross-Appellant Aviva Sports, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

   Aviva Sports, Inc. now known as "ASI, Inc."

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   ASI, Inc. f/k/a Aviva Sports, Inc., ("Aviva") is a wholly-owned subsidiary of Shrco, Inc., f/k/a ShoreMaster, Inc.  Shrco, Inc. is a wholly-owned subsidiary of Varistar Corporation, a Minnesota corporation that is wholly owned by Otter Tail Corporation.  Otter Tail Corporation is publically traded on the NASDAQ Stock Market.  Through its subsidiaries, Otter Tail Corporation, as parent corporation, owns 100% of Aviva's stock.

4.    The names of all law firms and the partners or associates that appeared for the party or Amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Dorsey & Whitney LLP, J. Thomas Vitt, David Y. Trevor, Michael Weinbeck Arthur, Chapman, Kettering, Smetek & Pikala, P.A., Keith M. Sorge, Blake W. Duerre, Paul E.D. Darsow, Ryan C. Sorge, Timothy J. Carrigan

__January 31, 2014_____          __s/J. Thomas Vitt_____
   Date                                        Signature of counsel

                                          _J. Thomas Vitt_____
                                              Printed name of counsel

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. ii

STATEMENT OF RELATED CASES ...................................................... xiv

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF ISSUES ........................................................................2

STATEMENT OF THE CASE AND RELEVANT FACTS ......................3

BACKGROUND .......................................................................................3

    I.    Manley's Pattern of False Advertising ....................................3

    II.    Aviva's Claims Against Manley and Certain Retailers .........5

KEY FACTS REGARDING MANLEY'S FALSE ADVERTISING ......7

    III.    Manley's Intent to Advertise Falsely ....................................7

    IV.    Harm to Aviva from False Advertising ..................................8

MANLEY'S LITIGATION MISCONDUCT AND COURT SANCTIONS ..........9

    V.    Manley's Misconduct Regarding Interrogatory No. 8 .........9

    VI.    Manley's Misconduct in Connection with Document
           Production ..............................................................................13

    VII.    Manley's Disingenuous Attempts to Deny Existence of Its
           American Operations ............................................................17

    VIII.    Manley's Misconduct Relating to 30(b)(6) Depositions ....17

    IX.    Manley's Defiance of Court Orders ....................................19

    X.    Dispositive Sanctions ...........................................................21

DISGORGEMENT AND ATTORNEY'S FEES ....................................22

    XI.    Order for Disgorgement .......................................................22

    XII.    Basis for Disgorgement Award .............................................24

XIII.  Basis for Lanham Act Fee Award ....................................................24

OTHER RULINGS AT ISSUE ON APPEAL AND CROSS-APPEAL ...............25

XIV.  Ruling on Aviva's Prudential Standing Against Manley....................25

XV.  Denial of Manley's Summary Judgment Motion................................25

XVI.  Ruling on Aviva's Prudential Standing Against the Retailer
Defendants...........................................................................................25

XVII. Judgment and Appeal .........................................................................26

ARGUMENT ...................................................................................................28

SUMMARY OF ARGUMENT ON MANLEY'S APPEAL .................................28

ARGUMENT ON MANLEY'S APPEAL ...........................................................33

I.  The District Court Properly Sanctioned Manley for Litigation
Misconduct ..........................................................................................33

    A.  Standard of Review.....................................................................33

    B.  Both Fed. R. Civ. P. 37 and the Court's Inherent Power
Authorize Dispositive Sanctions................................................34

    C.  Manley Willfully Violated Court Orders, Prejudicing
Aviva ..........................................................................................35

    D.  The District Court Showed Great Patience and Caution
Before Imposing Dispositive Sanctions.....................................41

    E.  Manley Has No Valid Objection to the Dispositive
Sanctions ....................................................................................42

    F.  The District Court Properly Exercised Its Discretion In
Imposing Monetary Sanctions Against Manley For
Litigation Misconduct ................................................................45

II.  The District Court Properly Awarded Aviva $6.4 Million as a
Disgorgement Remedy .........................................................................45

    A.  Standard of Review.....................................................................45

B.     Disgorgement Is An Available Lanham Act Remedy ..............45

C.     The District Court Appropriately Applied the Relevant Factors to Impose a Disgorgement Remedy On Manley..........49

D.     The District Court Appropriately Set the Disgorgement Amount....................................................................................52

III.   The District Court Properly Awarded Aviva a Portion of its Attorney's Fees and Costs Under the Lanham Act............................53

A.     Standard of Review...................................................................53

B.     The Lanham Act Authorizes Attorney's Fee Awards In "Exceptional Cases ................................................................53

IV.   Manley's Arguments Regarding Lanham Act Liability are Moot, Given the Dispositive Sanctions................................................55

A.     Standard of Review...................................................................55

B.     The Dispositive Sanctions Moot Manley's Substantive Liability Arguments ................................................................55

V.   Manley Was Not Entitled to Prevail on its Motions to Dismiss or for Summary Judgment on Prudential Standing and Lanham Act Liability .......................................................................................57

A.     Standard of Review...................................................................57

B.     The District Court Properly Held That Aviva Has Prudential Standing Against Manley, a Direct Competitor of Aviva.....................................................................................58

1.    The Conte Bros. Test....................................................59

2.    The Categorical Test......................................................61

3.    Reasonable-Interest Test...............................................61

C.     The District Court Properly Denied Manley's Summary Judgment Motion, Based on Highly Disputed Facts ...............62

1.     The District Court Properly Relied on Circumstantial Evidence at Summary Judgment............62

2.     Aviva Provided Evidence of Literal Falsity ..................63

3.     Aviva Provided Evidence of Materiality.......................64

4.     Aviva Provided Evidence That It Sustained an Injury.......................................................................65

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ON MANLEY'S APPEAL ..................................................................66

AVIVA'S CROSS APPEAL .....................................................................67

SUMMARY OF ARGUMENT .................................................................67

ARGUMENT .............................................................................................67

I.     Standard of Review .........................................................67

II.    The District Court Erred in Granting Summary Judgment to the Retailer Defendants on the Issue of Prudential Standing...................68

A.    The Appropriate Test for Prudential Standing is the Reasonable-Interest Test...........................................68

B.    At A Minimum, Factual Disputes Prevent Summary Judgment .......................................................69

C.    The United States Supreme Court Will Likely Clarify the Test for Prudential Standing During the Pendency of this Appeal .................................................72

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ON AVIVA'S CROSS APPEAL...................................................................73

PROOF OF SERVICE .............................................................................74

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ...........................................................74

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*Ackra Direct Mktg. Corp. v. Fingerhut Corp.*,
    86 F.3d 852 (8th Cir. 1996) ................................................................36

*ACLU Neb. Found. v. City of Plattsmouth*,
    419 F.3d 772 (8th Cir.2005) .............................................................67

*Adams v. Target Corp.*,
    No. 13-CV-5944 GHK (C.D. Cal. 2013)..........................................53

*Air Turbine Tech., Inc. v. Atlas Copco AB*,
    410 F.3d 701 (Fed. Cir. 2005) .........................................................65

*Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc.*,
    434 F.3d 1100 (8th Cir. 2006) ...................................................58, 61

*Am. Home Prods. Corp. v. Proctor & Gamble*,
    871 F.Supp. 739 (D.N.J. 1994)........................................................65

*Avionic Co. v. Gen. Dynamics Corp.*,
    957 F.2d 555 (8th Cir. 1992) ...........................................................34

*Banjo Buddies, Inc. v. Renosky*,
    399 F.3d 168 (3d Cir. 2005) ............................................................47

*Bayview Loan Serv., LLC v. Boland*,
    259 F.R.D. 516 (D. Colo. 2009) ......................................................37

*Bonds v. District of Columbia*,
    93 F.3d 801 (D.C. Cir. 1996)...........................................................37

*Brennan v. Qwest Comm's Int'l, Inc.*,
    2009 WL 1586721 (D. Minn.).........................................................35

*Briese Lichttechnik Vertriebs GmbH v. Langton*,
    2011 WL 280815 (S.D.N.Y.)..........................................................40

*Brunsting v. Lutsen Mountains Corp.*,
    601 F.3d 813 (8th Cir. 2010) ...........................................................57

*Cambridge Elec. Corp. v. MGA Elecs., Inc.*,
  227 F.R.D. 313 (C.D. Cal. 2004)....................................................37

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*,
  799 F.2d 6 (1st Cir. 1986)..............................................................69

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)........................................................................34

*Chavez v. Wal-Mart Stores, Inc.*,
  No. 13-CV-6429 GHK (C.D. Cal. 2013).........................................53

*Chrysler Corp. v. Carey*,
  186 F.3d 1016 (8th Cir. 1999) .......................................................34

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*,
  634 F.3d 1005 (8th Cir. 2011) ...............................................53, 54

*Coates v. Powell*,
  639 F.3d 471 (8th Cir.2011) ..........................................................57

*Cont'l Cas. Co. v. Compass Bank*,
  2006 WL 533510 (S.D. Ala.)..........................................................40

*Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*,
  165 F.3d 221 (3d Cir. 1998) ...............................................59, 60, 61

*Cowan v. Strafford R-VI School Dist.*,
  140 F.3d 1153 (8th Cir. 1998) .......................................................56

*Do v. Wal-Mart Stores*,
  162 F.3d 1010 (8th Cir. 1998) .......................................................63

*Dwelly v. Yamaha Motor Corp.*,
  214 F.R.D. 537 (D. Minn. 2003) ...................................................40

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*,
  561 F.3d 1298 (11th Cir. 2009) .....................................................55

*Everyday Learning Corp. v. Larson*,
  242 F.3d 815 (8th Cir. 2001) .........................................................35

*Fair Isaac Corp. v. Experian Info Solutions, Inc.*,
   650 F.3d 1139 (8th Cir. 2011) .............................................................53

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
   624 F.3d 106 (2d Cir. 2010) ..........................................61, 69, 70, 71

*Forsythe v. Hales*,
   255 F.3d 487 (8th Cir. 2001) .............................................................35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000)........................................................................48, 49

*George Basch Co., Inc. v. Blue Coral, Inc.*,
   968 F.2d 1532 (2d Cir. 1992) .............................................................47

*Hairston v. Alert Safety Light Prods., Inc.*,
   307 F.3d 717 (8th Cir. 2002) ........................................................34, 36

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
   634 F.3d 787 (5th Cir. 2011) .............................................................59

*Haskins v. Lister*,
   626 F.2d 42 (8th Cir. 1980) ...............................................................44

*Hunt v. City of Minneapolis, Minn.*,
   203 F.3d 524 (8th Cir. 2000) .............................................................36

*Hutchins v. A.G. Edwards & Sons, Inc.*,
   116 F.3d 1256 (8th Cir. 1997) ...........................................................33

*Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*,
   380 F.3d 1084 (8th Cir. 2004) ...........................................................33

*Johnson Intern. Co. v. Jackson Nat. Life Ins. Co.*,
   19 F.3d 431 (8th Cir. 1994) ...............................................................56

*Johnson v. Ventra Group, Inc.*,
   191 F.3d 732 (6th Cir. 1999) .............................................................56

*Kaufmann v. Siemens Med. Solutions USA, Inc.*,
   638 F.3d 840 (8th Cir. 2011) .............................................................67

*Keefer v. Provident Life & Accident Ins. Co.*,
238 F.3d 937 (8th Cir. 2000) ..............................................................35

*Keup v. Hopkins*,
596 F.3d 899 (8th Cir. 2010) ..............................................................55

*Kournikova v. Gen. Media Commc'ns Inc.*,
278 F.Supp.2d 1111 (C.D. Cal. 2003) .................................................61

*In re Kunstler*,
914 F.2d 505 (4th Cir. 1990) ..............................................................38

*Lee v. Max Int'l, LLC*,
638 F.3d 1318 (10th Cir. 2011) ..........................................................33

*Maier Brewing Co. v Fleischmann Distilling Corp.*,
390 F.2d 117 (9th Cir. 1968) ..............................................................51

*Maness v. Meyers*,
419 U.S. 449 (1975)............................................................................43

*Masters v. UHS of Del., Inc.*,
631 F.3d 464 (8th Cir. 2011) ........................................................46, 65

*Metric & Multistandard Components Corp. v Metric's Inc.*,
635 F.2d 710 (8th Cir. 1980) ..............................................................46

*Nat'l Hockey League v. Metro. Hockey Club*,
427 U.S. 639 (1976)................................................................33, 35, 57

*O'Connor v. Boeing N. Am.*,
185 F.R.D. 272 (C.D. Cal. 1999).........................................................37

*Ortho Pharm. Corp. v. Cosprophar, Inc.*,
32 F.3d 690 (2d Cir.1994) ..................................................................71

*Peter Kiewit Sons', Inc. v. Wall Street Equity Grp., Inc.*,
2013 WL 1914912 (D. Neb.)................................................................44

*Phoenix of Broward, Inc. v. McDonald's Corp.*,
489 F.3d 1156 (11th Cir. 2007) ..........................................................52

*Porous Media Corp. v. Pall Corp.*,
    110 F.3d 1329 (8th Cir. 1997) .............................................................51

*Quick Techs., Inc. v. Sage Grp. PLC*,
    313 F.3d 338 (5th Cir. 2002) ...............................................................47

*Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*,
    93 F.3d 511 (8th Cir. 1996) .................................................................60

*Rodgers v. Univ. of Mo.*,
    135 F.3d 1216 (8th Cir. 1998) .............................................................36

*Rottlund Co., Inc. v. Pinnacle Corp.*,
    222 F.R.D. 362 (D. Minn. 2004) .........................................................38

*S.E.C. v. AbsoluteFuture.com*,
    393 F.3d 94 (2d Cir. 2004) ..................................................................45

*S.E.C. v. Lawton*,
    449 F. App'x 555 (8th Cir. 2012) ........................................................45

*Safco Prods. Co. v. Welcom Prods., Inc.*,
    799 F.Supp.2d 967 (D. Minn. 2011)....................................................46

*Schoffstall v. Henderson*,
    223 F.3d 818 (8th Cir. 2000) ...............................................................35

*Shcherbakovskiy v. Seitz*,
    2011 WL 6185446 (2d Cir.) .................................................................56

*Southern Leasing Partners, Ltd. v. McMullan*,
    801 F.2d 783 (5th Cir. 1986) ...............................................................38

*St. Paul Area Chamber of Commerce v. Gaertner*,
    439 F.3d 481 (8th Cir. 2006) ..........................................................57, 67

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
    697 F.3d 387 (6th Cir. 2012), *cert. granted* 133 S.Ct. 2766 (June 3,
    2013) ...........................................................................................*passim*

*In re Sulphuric Acid Antitrust Litig.*,
    231 F.R.D. 320 (N.D. Ill. 2005).........................................................37

*Sulzer Textil A.G. v. Picanol N.V.*,
  358 F.3d 1356 (Fed. Cir. 2004) .........................................................33

*Synergistic Int'l, LLC v. Korman*,
  470 F.3d 162 (4th Cir. 2006) .............................................................47

*Tax Servs. of Am., Inc. v. Mitchell*,
  2008 WL 2756950 (D. Colo.).............................................................44

*Truck Equip. Serv. Co. v. Fruehauf Corp.*,
  536 F.2d 1210 (8th Cir. 1976) ...........................................................47

*Turbon Intern., Inc. v. Hewlett-Packard Co.*,
  769 F.Supp.2d 262 (S.D.N.Y. 2011) ..................................................70

*United Indus. Corp. v. Clorox Co.*,
  140 F.3d 1175 (8th Cir. 1998) ......................................................63, 64

*In re Wechsler*,
  121 F.Supp.2d 404 (D. Del. 2000).....................................................56

**Statutes**

15 U.S.C. § 1117(a) ................................................................46, 53, 66

15 U.S.C. § 1125........................................................................1, 5, 68

28 U.S.C. § 1331 ....................................................................................1

Minn. Stat. § 325D.43-.48 ..................................................................5, 6

**Other Authorities**

Fed. R. Civ. P. 26(g) ...........................................................................38

Fed. R. Civ. P. 30(b)(6)...................................................................*passim*

Fed. R. Civ. P. 33(d) .......................................................................*passim*

Fed. R. Civ. P. 37 ................................................................................30

Fed. R. Civ. P. 37(b)(2)A....................................................................34

Fed. R. Civ. P. 37(d)(1)........................................................................40

Fed. R. Civ. P. 54(d)(1)..............................................................................54

5 J. Thomas McCarthy, *McCarthy on Trademarks* §27:32 (4th ed. 2010) ..............................................................................................68

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to 47.5(b) of the Rules of Practice of the United States Court of Appeals for the Federal Circuit, counsel for Plaintiff-Cross-Appellant Aviva Sports, Inc. ("Aviva") identifies the following related case pending in the United States Supreme Court that counsel believes will or may directly affect this Court's decision in the pending appeal: *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 410-11 (6th Cir. 2012), *cert. granted* 133 S.Ct. 2766 (June 3, 2013) (No. 12-873).

The *Lexmark* case addresses the standard for determining whether a Lanham Act plaintiff has prudential standing. The application of that standard is raised by Appellant Manley Toys, Ltd. ("Manley") in its appeal and also by Cross-Appellant Aviva in its cross-appeal.

## <u>JURISDICTIONAL STATEMENT</u>

In addition to the grounds cited by Manley, the District Court had

jurisdiction in this matter pursuant to 28 U.S.C. § 1331, based on Aviva's claims

pursuant to 15 U.S.C. § 1125 ("Lanham Act").  Aviva's cross-appeal is timely

based on the final judgment dated August 21, 2013 and cross-appeal of September

20, 2013.

## <u>STATEMENT OF ISSUES</u>

1.      Whether the District Court properly exercised its discretion in imposing dispositive and monetary sanctions against Manley, where Manley engaged in various acts of litigation misconduct and repeatedly defied court orders to comply with discovery obligations and pay monetary sanctions?

2.      Whether the District Court properly required Manley to disgorge profits it unjustly earned through false advertising in violation of the Lanham Act, where the conduct was willful and deliberate, the false ads deceived the public and disgorgement was necessary to deter future wrongdoing?

3.      Whether the District Court properly awarded Aviva some of its attorney's fees under the Lanham Act provision for "exceptional cases," where Manley's conduct was deliberate?

4.      Whether Manley's substantive liability and prudential standing arguments are moot, where liability was a sanction for litigation misconduct, and allowing Manley to escape the effect of that sanction would destroy its effectiveness?

5.      Whether the District Court properly denied Manley's prudential standing and liability motions, where Aviva and Manley were direct competitors and substantial evidence showed Manley's pattern of false advertising?

6.      Whether the District Court erred in granting summary judgment to the Retailer Defendants on prudential standing grounds, where Aviva sells some products at retail in competition with the Retailer Defendants and where the Retailer Defendants' use of Manley's false advertising harmed Aviva's efforts to sell its own products?

## STATEMENT OF THE CASE AND RELEVANT FACTS

Manley appeals from a District Court judgment that was based on dispositive and monetary sanctions for Manley's litigation misconduct and that awarded Aviva disgorgement of profits and attorney's fees. Manley addresses these critical issues only in a cursory manner, at the end of its brief. Aviva describes the relevant facts and Court rulings in detail below:

## BACKGROUND

### I. __Manley's Pattern of False Advertising__.

Aviva and Manley both manufactured inflatable water slides and pools. Sixty-three specific Manley products competed directly with Aviva products. A4D.

Manley falsely advertised its products to make them look larger and more spacious than they actually were, and therefore more attractive for children to play in. A16.

First, Manley constructed oversized versions of the product for the advertising image, so that the pool or slide in the picture was larger than the actual Manley product. *Id.* Second, instead of using pictures of actual children using the product, Manley took separate pictures of children, reduced them from their actual size and "photoshopped" them into the advertisement. *Id.* This made the product appear relatively larger than the children using it. The technique of using larger-than-actual products and photoshopping in smaller-than-actual pictures of children

3

was Manley's standard practice.  A38-A39.

Aviva's expert, Dr. David Krauss, physically examined 26 Manley products and analyzed the packaging of 36 others.  A39.  He concluded that many of the packages misrepresented the size of the product by shrinking the children relative to the size of the product.  Children who were five to ten years old appeared to be the size of toddlers or babies.  A39-A40.[1]

The effect of these techniques can be seen by contrasting the Manley advertisement for a product with an actual photograph of real children using the real product.  The examples below are from the record in this case:

| **Manley Advertisement** | **Actual Photo** |
| --- | --- |
|  | |

---

[1]    Krauss did not find any of the images to be accurate.  Some were more inaccurate than others.



 

A8239.

In each instance, Manley's advertisement portrays a spacious product in which several children have ample room to play, while the accurate picture reveals a much smaller product in which the same number of children (or even fewer) are cramped and unable to play freely.

Manley used these techniques for virtually all of its products over a period of a number of years. A38-A39. Manley did not change its method of advertising products over the years. *Id.*

## II.  **Aviva's Claims Against Manley and Certain Retailers**.

Aviva sued Manley for violations of the Lanham Act, 15 U.S.C. § 1125, and Minnesota's Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. §§ 325D.43 -

.48, for false advertising, and for patent infringement.[2]  Aviva sought damages

and/or disgorgement of Manley's profits, injunctive relief, costs, and attorney's

fees.

Aviva also sued Fingerhut Direct Marketing, Inc., Menard, Inc., Kmart

Corporation, and Wal-Mart Stores, Inc. (collectively, the "Retailer Defendants").[3]

The Retailer Defendants sold Manley products that displayed the false advertising.

Manley's waterslides were sold to consumers by the Retailer Defendants in

their deceptive packaging and using deceptive images.  A6114, A9157.  The

Retailer Defendants used deceptive images online and in brick-and-mortar stores.

A9157.

The Retailer Defendants typically displayed Aviva and Manley products

together.  A3724.  The deceptive Manley images were generally on the same web

page as the Aviva ads.  A1335-A1343.

Aviva also competed directly with the Retailer Defendants for online sales

of waterslides, sold on their respective websites.  A6114, A9157.  Aviva's direct-

to-consumer sales increased to nearly seven percent between June 2008 and

August 2010.  A3468.  But Aviva's direct-to-consumer sales of its other products

---

[2]   The patent claims were eventually dismissed and are not at issue on this appeal.

[3]   Aviva and Wal-Mart settled, and Wal-Mart is not a party to this appeal.  As to
the remaining Retailer Defendants, Aviva has elected not to pursue the MDTPA
claims on its cross-appeal and only seeks reversal of the dismissal of the
Lanham Act claims.

(which did not compete with false Manley ads) grew even more rapidly in this period. *Id.*

## KEY FACTS REGARDING MANLEY'S FALSE ADVERTISING

### III.  Manley's Intent to Advertise Falsely.

Manley's false advertising was intentional.  Aviva presented the testimony of Rachel Harris and Peter Kallemeyn, two individuals involved in the design and creation of Manley's false images.  Harris testified that she and the design team were instructed to miniaturize the children in the images, making the products appear larger, for "[a]lmost every package."  A9911.  Additionally, some of the products pictured were custom-made to be 20 percent larger than the actual product.  Product managers knew that some consumers had complained of being deceived and that it was "physically impossible" to put as many children in the actual pool as were pictured.  A9913.

Kallemeyn testified that the design team was instructed to minimize the size of the children, who were "[n]ever" sized accurately.  A9969.  This was done to show that "the product is huge and really showcase that."  *Id.*  The product used for photo shoots "typically was 25 percent larger than the actual product than the consumer would buy in the store."  A9970.

The design team was embarrassed by the alterations:  "what we were doing is – is, you know, lying to people."  A9971.

Manley personnel in Hong Kong received all of the doctored advertising images. A17. Harris testified that sometimes the merging of the image with the product branding was performed by Manley in Hong Kong, and Kallemeyn testified that all of the files would be sent to Manley in Hong Kong where Manley would do the "final artwork." *Id.*

Manley was also aware of consumer complaints about the misleading ads. A19. However, Manley simply continued to produce the same type of false advertising for its products. *Id.*

The Court found that "[t]here is no question that Manley's misconduct was willful, deliberate and intended to deceive—it can be characterized no other way." *Id.*

## IV.   **Harm to Aviva from False Advertising**.

Manley's false advertising harmed Aviva. Hal Poret, a market research expert, conducted surveys comparing the reaction of consumers to Manley and Aviva (and other) products both with and without the false Manley advertisements. A42. When the false Manley advertising was utilized, 69 percent of the consumers preferred Manley products, and only 10 percent preferred Aviva products. (*Id.*) However, when all products used accurate images, only 25 percent of consumers preferred Manley products, while 28 percent preferred Aviva products. A42-A43.

Eventually, in January 2012, Aviva ceased business. A11. As the District

Court stated, Aviva's business had been "smothered … in its crib" by Manley's false advertising and deception. A24.

## MANLEY'S LITIGATION MISCONDUCT AND COURT SANCTIONS

As detailed below, Manley engaged in pervasive litigation misconduct and committed at least **nine** clear violations of **seven** different Court Orders[4] with respect to: (1) Answering Interrogatory No. 8, which sought key financial and damages-related information; (2) Reimbursing Aviva for a share of document production costs, which had been greatly inflated by Manley's misconduct; (3) Paying monetary sanctions awarded to Aviva for necessary discovery motions; and (4) Providing a properly-prepared witness for a Rule 30(b)(6) deposition.

## V. Manley's Misconduct Regarding Interrogatory No. 8.

Aviva served interrogatories on Manley on September 9, 2010. A1446-A1460, A1497-A1501. Interrogatory No. 8 requested detailed information on Manley's annual sales, broken down by product, and cost and profit information. A4941-A4949. Manley *never* adequately answered Interrogatory No. 8. Manley first responded by invoking Fed. R. Civ. P. 33(d) and directing Aviva to documents it produced in October 2009, claiming that the requested information could be found in the documents by Aviva as easily as by Manley. A4941-A4949, A4953-

---

[4] The Court's January 3, 2012 Order (A81-A123) compelled Manley to correct prior discovery shortcomings with respect to an interrogatory answer, document production and a 30(b)(6) deposition. As described *infra*, Manley violated the Order as to *all three* of those subjects

A4955.

In response to Aviva's motion to compel, (A4086-A4087) on January 3,

2012, the District Court found that Manley had not properly invoked Rule 33(d),

because Aviva could not efficiently derive the requested information from

Manley's response. The Court gave Manley two weeks to make its answer

adequate, citing the lack of Bates numbers or clear descriptions of the documents

that could be used to answer the interrogatory. A71-A72.

Manley's supplemental answer described its *attempts* to identify such

documents, but did not correctly specify the responsive documents. A9640.

Instead, Manley listed nearly a half million documents, conceding that many were

not responsive. *Id.* Manley also promised an "updated response" more than three

weeks after the District Court's deadline. *Id.* Manley then provided an additional

answer, 24 days late, now identifying 44,000 documents, but still with no

explanation of how those documents answered the interrogatory. A9768-A9784.

In a follow-up motion to compel, Aviva, in addition to pointing out these

deficiencies, countered Manley's claim that it had no summary sales reports to

answer the interrogatory. Aviva obtained a declaration from a former AquaWood

employee (AquaWood is an entity controlled by Manley), A2678-A2701, who had

created such summary sales reports for Manley. A139.

On May 11, 2012, the District Court granted Aviva's motion to sanction

Manley for again failing to answer the interrogatory. A124-A149. The Court

determined that Manley had once more wrongly invoked Rule 33(d) and

committed related misconduct. A145-A146. The Court found that "Manley sent

Aviva on a wild goose chase through 44,000 pages and knew from the very

beginning that Aviva would be unable to answer Interrogatory No. 8 using those

documents." A146. The Court also criticized Manley for its decision to

"unilaterally [give] itself a three-week extension . . . [and] provide[] an answer that

can at best be described as 'half-baked,'" and for its "serious and disturbing . . .

pattern of hide-the-ball gamesmanship regarding discovery." A143.

The Court concluded that Manley's conduct warranted sanctions, although

"not the extreme sanction of dismissal." A146. The Court ordered Manley to

answer the interrogatory by June 1, 2012, without using Rule 33(d), and to pay

Aviva's attorney's fees and costs on its motion for sanctions.

On June 8, 2012, a week *after* the deadline for compliance in the May 11

Order, Manley requested additional time, claiming its counsel had not read the

District Court's order setting the deadline (although counsel admitted receiving

ECF notice of the ruling). A10796-A10797.

The District Court rejected "Manley's improper request": "One would think

that in light of this Court's repeated warnings to Manley about its litigation tactics

that Manley would not have made such an ill-advised request." A168. The Court

11

also rejected Manley's complaint about Aviva's attorney's fees as "sheer 'chutzpah,'" concluding that "Manley sent Aviva on a goose chase and now shall have the pleasure of paying for it." A174-A175.

The District Court ordered Manley to pay $121,184.40 to Aviva's counsel for the interrogatory-related motion practice. A175. The Magistrate Judge, noting that she had "rarely encountered a litigant so adverse to following the Court's orders," stated that getting Manley to obey the Order to pay fees was "the greater challenge." *Id*. She ordered Manley to pay in full by September 21, 2012. A176.

The Court also ordered Aviva to notify the Court if Manley failed to pay, so the Court could "then consider what additional sanctions are warranted." *Id*.

Manley did not pay. Instead, four days late, it objected to the ruling. A11031-A11035. The District Court affirmed the order. A185-A186.

Aviva again moved for default judgment for Manley's failure to answer the interrogatory. A10838-A10839. Manley served a supplemental interrogatory answer shortly before the July 2, 2012 hearing on this motion. A11041, A10996-A1106. The new answer had dubious value, however, because it showed no Manley profits on its products. A11042-A11044. Moreover, it failed to provide Bates numbers for supporting documents, again violating the District Court's Order. *Id*. Manley admitted to the Court that its supplemental answer did not "in exacting detail compl[y] with your order." A11051.

12

## VI.     __Manley's Misconduct in Connection with Document Production__.

Aviva served document requests on Manley, covering the main issues in the case. A1146-A1460, A1497-A1501. Manley stated that it would produce responsive documents at Manley's offices in China. A1469. Manley estimated that it had "more than sixty" boxes of documents. A1566.

Aviva advised the District Court that it was willing to pay for the shipment of the Chinese documents to the United States for inspection here. P. 6, 8 A1636-A1638. Manley responded that it used the documents for its day-to-day operations and would only produce photocopies. A1637. *Id.* In ruling on Aviva's motion to compel, the Court instructed Manley to produce copies of the documents in Minneapolis at Aviva's expense. A1638. *Id.* The Court expected "a fulsome discussion by the attorneys on how to do this in a reasonable and cost-effective manner." A1698. *Id.* The Court ordered Manley to provide Aviva with a proposal describing the planned production, costs, and timing. A1623.

Manley estimated it would cost approximately $145,000 to copy about 200,000 pages. A3907-A3913. Aviva objected. A86. Counsel for Aviva and Manley negotiated for several weeks, but Manley insisted that Aviva authorize the copying or forego production. A88. Aviva reluctantly agreed. *Id.*

The copying took three months, in part because Manley provided about *250* boxes containing more than a *half million* documents. A190-A191. The cost was

13

$567,569.38. *Id.* Aviva's initial review showed that 80 to 90 percent of the documents were non-responsive, relating, for example, to a golf tournament, slippers, purses, plush toys, a production worker's illness, a petty cash slip, and other irrelevant matters. A90-A91.

Aviva moved for reconsideration of the Order (issued on Aviva's motion to compel) requiring Aviva to pay all production costs. A3866-A3867. Aviva presented a declaration from the vendor hired for the copying project, who said his company was "hindered [in] the collection and scanning process" by Manley. A3935-A3940. A number of the documents had been shipped from the United States to China as recently as August 2010. A3939.

On January 3, 2012, as part of the same Order addressing Interrogatory No. 8 and Aviva's attempts to take a 30(b)(6) deposition of Manley, the District Court granted Aviva's motion for reconsideration and ordered that the costs of the China production no longer be borne solely by Aviva, but instead be shared equally between the parties. A81-A123. Reviewing each party's role, the Court found that Manley engaged in a broad array of misconduct, but that Aviva should have acted more quickly to call Manley to account. A96-A101. Manley's failure to send counsel to China to oversee production; its misleading estimates of the volume of documents; and its shipment of documents from the United States to China, were all improper. A99-A100. The Court held that Aviva failed to return quickly

14

enough to the Court for guidance when the costs began to increase and to have its own representative present in China. A100. On reconsideration, the Magistrate Judge found that Aviva should not have to bear all the copying costs and ordered that the costs be equally split between the parties. A101.

The District Court affirmed. A9592-A9605, A10119. When Manley did not pay, Aviva moved for default judgment. A10174-A10180. Manley contended it had not violated the Order because it lacked a "date certain" when the money was due, and because Manley proposed a payment plan. A187-A226.

On May 9, 2012, the District Court rejected Manley's contention that it was not obligated to reimburse Aviva for the copying costs and specifically ordered Manley to pay Aviva $238,254 by May 21, 2012. A10685.

Manley did not pay. Instead, Manley submitted a payment plan proposing initial payments of $3,000 a month. A10760-A10766. Aviva again moved for default judgment or, in the alternative, an order requiring Manley to pay within five business days or risk entry of default judgment. A10752-A10753.

Manley still did not pay. Manley claimed that a payment plan was the "only reasonable way forward." A10785-A10788. Raymond Choi, a Manley consultant, stated that Manley had cash-flow problems, and that a payment plan "is the best alternative for both Manley and Aviva." A10789-A10793.

On June 15, 2012, the Magistrate Judge again ordered Manley to make full

payment, this time by June 27, 2012. A150. The Court rejected Manley's claim that it was experiencing cash-flow problems and described Manley's payment proposal as "laughable." A150-A155. The Court noted that default judgment was a severe sanction and that it would grant Manley one last chance to comply with its order by delivering a certified check to Aviva before the close of business on June 27, 2012. A155. The Court also ordered Aviva to document its reasonable attorney's fees and costs, to be submitted to the Court if Manley did not pay. *Id.*

The Court also ordered that Aviva notify the Court of non-compliance by Manley, at which point the Magistrate Judge would "issue a Report and Recommendation to Judge Ericksen recommending that default judgment be entered." *Id*.

On June 27, Manley objected to the Magistrate Judge's order. A10870-A10874. It did not make payment. *Id.* The District Court affirmed, finding that "Manley provides no support for its contention that it is unable to make the required payment." A157.

The District Court also awarded Aviva $3,000 in attorney's fees for Aviva's motion to compel Manley to actually pay the ordered reimbursement. A177-A184. Manley filed objections without delivering a check to Aviva. A11031-A11035, A197. The District Court again affirmed, concluding that the "Magistrate Judge, in fact, exercised admirable restraint" in the sanctions she imposed. A185-A186.

16

## VII.  **Manley's Disingenuous Attempts to Deny Existence of Its American Operations**.

One recurring issue in Manley's discovery misconduct was its refusal to produce information and documents already located in the United States.  Manley contended that it had no actual U.S. operations and refused to cooperate in discovery sought from U.S. entities called ToyQuest and AquaWood.  A1563.  It insisted that Aviva subpoena those documents and witnesses from those entities.  *Id.*

Even though many of the products in question in the case were labeled "ToyQuest, a division of Manley," Manley contended that ToyQuest was nothing more than a trademark or trade name.  A1569.

Ultimately, the District Court found that ToyQuest and AquaWood were in fact Manley divisions, based on the notation on packaging and catalogs; representations Manley itself made; and testimony by AquaWood President Brian Dubinsky, who stated that ToyQuest was a d/b/a of AquaWood.  A2689-A2690.

## VIII.  **Manley's Misconduct Relating to 30(b)(6) Depositions**.

Aviva served a 30(b)(6) deposition notice on Manley for a January 11, 2010 deposition, listing topics central to key liability and damages issues.  A104.  Manley produced Alan Chan, the son of Manley's owner, as its corporate designee.  A104-A105.  Chan was unprepared as to numerous topics, in part because Manley

17

had refused to show him any documents that Manley itself had designated as confidential, and Manley took the position that Chan could not be shown those documents by Aviva at the deposition. A114-A115. The Court determined that Chan "was woefully unprepared to respond" as to seven specific topics including the design and manufacture of product packaging; the design and manufacture of the specific products at issue; the revenues, units, costs and profits from the sale of the products in question; Manley's business plans and marketing projections for the products in question; any Manley surveys or market research relating to the products in question; the ownership and organizational structure of Manley itself; and Manley's response to customer complaints concerning the products in question. A116.

Manley was ordered to produce a properly prepared witness on those topics and to give that witness access to Manley's confidential documents. *Id.*

However, the new witness, Richard Toth, the president of a company called Manley Toys Direct, was even less prepared. A234. That deposition commenced on June 7, 2012 and was continued, at Manley's insistence, on December 11, 2012. *Id.* Toth's entire preparation apparently consisted of reviewing typewritten answers to the topics, provided by Manley's Chinese counsel. A235. As the Court found in ordering sanctions against Manley for this non-compliance with its earlier order, "Toth seemed to have no idea why he was selected as a corporate deponent."

18

A238.  Toth knew very little about how Manley did business and had no knowledge at all of Aviva until three days before the deposition.  A238-A239. Toth repeatedly "expressed his misunderstanding that he would not have to answer any questions (or provide any answers) 'off script.'"  A239.  Toth had not spoken with anyone from the actual defendant, Manley Toys, Ltd.  *Id.*  Toth had no information beyond the script and therefore was unable to answer follow-up questions.  *Id.*

On March 20, 2013, the Court granted in part Aviva's sanctions motion for Manley's failure to comply with the prior Order, finding that "Manley's decision to send Toth to the deposition armed with little knowledge beyond the notes provided by [Manley] is indefensible."  It was "abundantly clear that counsel willfully disregarded this court's order regarding this deposition."  A247-A248.

## IX.   **Manley's Defiance of Court Orders**.

Manley committed at least nine violations of seven different Court orders relating to discovery, summarized in the chart below.  Four orders contained specific warnings by the Court that failure to comply would have further consequences, including, on June 15, 2012, a statement by the Magistrate Judge that she would recommend a default judgment if Manley failed to comply:

## Summary of Court Orders Defied by Manley

| Date and Docket No. | Directive that Manley violated | Stated Consequences for Failure to Comply |
|---|---|---|
| January 3, 2012 Dkt. No. 508 A81 | Manley to pay one-half of Chinese copying costs | N/A |
| January 3, 2012 Dkt. No. 508 A81 | Manley to answer Interrogatory No. 8 by January 17, 2012, specifying Bates Numbers of responsive documents | N/A |
| January 3, 2012 Dkt. No. 508 A81 | Manley to provide a properly-prepared 30(b)(6) witness | "Court will entertain a motion for sanctions" |
| May 7, 2012 Dkt. No. 593 A10678 | Manley to pay $238,254 as one-half cost of Chinese document production by May 21, 2012 | N/A |
| May 11, 2012 Dkt. No. 601 A124 | Manley to answer Interrogatory No. 8 and specify relevant Bates Numbers by June 1, 2012 | N/A |
| June 15, 2012 Dkt. 638 A150 | Manley to pay $238,254 as its share of Chinese document production by June 27, 2012 | "Court shall then . . . recommend[] . . . default judgment" |
| September 6, 2012 Dkt. No. 695 A165 | Manley to pay attorney's fees of $121,184.40 by September 21, 2012 | "Court shall then consider what additional sanctions are warranted" |
| September 7, 2012 Dkt. No. 696 A185 | Manley to pay attorney's fees of $3,000 by September 21, 2012 | "Court shall then consider what additional sanctions are warranted" |
| July 23, 2013 Dkt. No. 820 A255 | Manley to pay attorney's fees of $20,540.50 in connection with 30(b)(6) deposition issues | N/A |

## X.   <u>Dispositive Sanctions</u>.

On January 8, 2013, faced with Manley's ongoing non-compliance with the orders in Docket Nos. 508, 594, 601, 638, 695 and 696,[5] the Magistrate Judge did exactly what she had repeatedly said she was going to do:  issue a Report and Recommendation (A187-A226) assessing dispositive sanctions, based on Manley's repeated violation of Court orders relating to discovery and payment of monetary sanctions.

The Report and Recommendation was adopted by Judge Erickson on February 6, 2013.  A227-A228.  The Court ordered a default judgment against Manley on liability under the Lanham Act and prohibited Manley from opposing Aviva's request for disgorgement of Manley's profits as a remedy.  The Court summarized Manley's misconduct:

> Manley has intentionally disobeyed every Order, has never offered any viable excuse for its willful conduct, and Aviva has been irreparably prejudiced in its ability to prepare for trial by the drain on its resources.

A219.  The sanctions were supported by "the totality of Manley's behavior." A222.

---

[5]   Manley's ongoing misconduct relating to the 30(b)(6) deposition was not part of the default judgment process.  Because of Manley's delays in producing its second unprepared witness, that issue was submitted separately to the Court in a later motion, resulting in additional monetary sanctions against Manley.

The Court also described the case as "an unending battle by Aviva to secure Manley's compliance with this Court's sanctions and discovery orders." The Court also noted that its orders "have been explicit and detailed in their instructions to Manley regarding its obligation." A219. The Court found that Manley's violations were intentional and unexcused, and irreparably prejudiced Aviva *Id.*

The Court noted that all past efforts to bring Manley into compliance with the Court's orders had failed, and that it had exhausted the lesser sanctions available to it. A222.

## DISGORGEMENT AND ATTORNEY'S FEES

**XI.** <u>**Order for Disgorgement**</u>.

Following the imposition of dispositive sanctions, the Court took up the issue of disgorgement of Manley's profits. A11750-A11757. The Court had previously held that Aviva did not have sufficient evidence of Aviva's own lost profits and that an injunction was inappropriate, so disgorgement was the only remaining remedy available under the Lanham Act. A80.

In analyzing Aviva's entitlement to disgorgement, the Court noted that the disgorgement remedy under the Lanham Act "exists to deter would-be infringers and to safeguard against unjust enrichment" and acts as a "deterrence of a willful infringer." A14. The Court found that both rationales justified disgorgement here:

Disgorgement of Manley's profits is necessary to prevent Manley's unjust enrichment from its shameless false advertising practices, as

well as to deter Manley from such conduct in the future.

A22.  The Court found "abundant evidence demonstrating Manley's intent to confuse or deceive the public."  A15.

Disgorgement was not barred by Aviva's lack of sufficient evidence to prove Aviva's own lost profits.  A14.  Aviva was certainly harmed by Manley's actions: "Manley came along with its false advertising and smothered [Aviva's competitive business] in its crib."  A24.  The Court also pointed out that "Aviva's inability to produce such [damages] evidence was likely compounded by Manley's intentional and egregious misconduct and brazen refusal to provide any meaningful discovery on that subject."  A13.

The Court found that Aviva "diligently acted as the vicarious avenger of consumer rights … Aviva persisted, despite Manley's tireless attempts to evade discovery and obstruct the judicial process."  A22.  (quotations and citations omitted.)  The District Court noted that Manley's "abusive litigation tactics" caused the lawsuit to drag on for four years, until Aviva no longer could obtain injunctive relief, because Aviva had gone out of business.  Disgorgement was the only remaining effective remedy, and denying it "would only encourage the sort of shocking misconduct that Manley has exhibited."  Failing to grant a disgorgement remedy "would be condoning Manley's litigation misconduct and sending the message that a defendant can avoid liability for deceptive false advertising if it can

vexatiously protract litigation until the plaintiff has exhausted its resources."

## XII. Basis for Disgorgement Award.

In computing the disgorgement amount, the Court noted that it had the authority to require Manley to disgorge all profits on the offending products, even if not caused by the false advertising.  A14.

However, the Court actually imposed a much more limited remedy.  The Court found that Manley had earned $17.85 million in profits through false advertising during 2003 through 2011, the time it competed with Aviva.[6]  A23. The Court then adjusted that figure to $15.7 million by subtracting Manley's profits on sales to Target, because there was insufficient evidence tying Aviva's lost sales to Target to Manley's actions.  A23-A24 . The Court determined that Manley should disgorge $6.4 million, based on the Poret study showing what percentage of people would have purchased Aviva products if Manley had advertised honestly.

## XIII. Basis for Lanham Act Fee Award.

The Court also found that this was an "exceptional case" under the Lanham Act and awarded Aviva a total of $1,805,952.69 in costs and fees (out of over $3 million requested by Aviva).  A28.  The Court based the "exceptional case"

---

[6]  Given Manley's argument that Aviva should not receive disgorgement profits because Aviva has exited this market, it is important to note that the Court's disgorgement award only covers the period when the two companies competed. Aviva is not receiving any profits Manley made after Aviva left this business.

designation on Manley's pattern of "willful and deliberate" false advertising.  A25.
The Court also referenced "Manley's evasive and at times deceptive responses to
the discovery process."  A27.

## OTHER RULINGS AT ISSUE ON APPEAL AND CROSS-APPEAL

### XIV. **Ruling on Aviva's Prudential Standing Against Manley**.

Manley moved to dismiss Aviva's Lanham Act and MDTPA claims on
standing grounds.  On May 26, 2010, the District Court denied this motion.
A1404-A1406.  When Manley renewed its standing challenge on March 18, 2013,
the District Court affirmed its earlier ruling.  A11728**.**

### XV. **Denial of Manley's Summary Judgment Motion**.

Manley moved for summary judgment against Aviva, claiming that Aviva
lacked prudential standing under the Lanham Act and that Aviva could not prove
its false advertising claims.  The District Court denied this motion on Nov. 8, 2011.
A30-A80.  As to prudential standing, the Court held that because Manley and
Aviva were direct competitors, Aviva fell into the category of persons whom
Congress intended to be able to bring Lanham Act claims.  A37.  The Court then
found that factual disputes about the elements of false advertising precluded
summary judgment.  A37-A52.

### XVI. **Ruling on Aviva's Prudential Standing Against the Retailer Defendants**.

Aviva cross-appeals the dismissal of its claims against the Retailer
Defendants.  On June 27, 2012, the District Court granted Wal-Mart summary

judgment, ruling that because Aviva does not compete with Wal-Mart, it lacks

prudential standing.  Add1 – Add12.  On September 23, 2011, the District Court

granted summary judgment to the remaining Retailer Defendants, applying the

same reasoning.  Add13 – Add25.

The Court also dismissed Aviva's MDTPA claims against the retailers.  *Id*.

**XVII. Judgment and Appeal.**

The Court entered final judgment on August 21, 2013.  A10.  Manley

appealed on September 10, 2013.  (App. Dkt. 1.)  Aviva cross-appealed the grant

of summary judgment to the Retailer Defendants on September 20, 2013. (Cross.

App. Dkt. 1.)  The total judgment is $8,588,931.19, summarized below:

| Basis for Award | Order Imposing Sanction or Award | Order Setting Monetary Amount | Monetary Amount |
|---|---|---|---|
| Reallocating costs due to Manley's misconduct in production of documents | January 3, 2012 (Dkt.#508) | May 9, 2012 (Dkt.#594) | $238,254 |
| Sanction for Manley's failure to answer Interrogatory No. 8 and related misconduct | May 11, 2012 (Dkt.#608) | September 6, 2012 (Dkt.#695) | $121,184 |
| Sanction for Manley's failure to pay sanctions already ordered | June 6, 2012 (Dkt.#638) | September 7, 2012 (Dkt.#696) | $3,000 |
| Sanction for misconduct in connection with 30(b)(6) deposition | March 20, 2013 (Dkt.#797) | July 23, 2013 (Dkt.#820) | $20,540.50 |
| Disgorgement of profits after Manley's litigation misconduct caused lawsuit to extend until Aviva left the market | August 6, 2013 (Dkt.#822) | August 6, 2013 (Dkt.#822) | $6,400,000 |
| Attorney's fees based on the Lanham Act claims being an "exceptional case" and costs | August 6, 2013 (Dkt.#822) | August 6, 2013 (Dkt.#822) | $1,105,673.82 (fees) $700,278.87 (costs) |

# ARGUMENT

## SUMMARY OF ARGUMENT ON MANLEY'S APPEAL

This case is about Manley's persistent refusal to honor its obligations, or even to acknowledge them. First, Manley had an obligation to compete honestly through accurate product advertisements. Second, Manley was obligated to litigate by the rules, meeting discovery obligations and obeying court orders. Manley violated those obligations, repeatedly, egregiously, and willfully. For years, Manley deliberately falsified its advertisements to fool consumers with a deceptive picture of its products. Once Aviva sued, Manley refused to produce documents, answer interrogatories, and prepare witnesses as required. The Court issued order after order requiring compliance, but Manley simply defied those orders, committing at least nine separate violations of seven different orders.

Ultimately, the District Court could no longer tolerate Manley's lawless behavior. After multiple unsuccessful attempts to secure Manley's compliance through clear directives about what the discovery rules required, and then by monetary sanctions, the District Court had no choice but to impose dispositive sanctions, including a default judgment as to Lanham Act liability. The Court then ruled that the appropriate remedy was disgorgement, and that this was a truly "exceptional case," permitting an award of fees.

Even on appeal, Manley still refuses to acknowledge its misconduct. The

key issues in this case, dispositive sanctions, disgorgement, and the award of Lanham Act fees, are buried inconspicuously in the last ten pages of Manley's brief. Manley tries to divert this Court's attention to preliminary rulings denying summary judgment and a motion to dismiss. But those issues are not even "live" on appeal. The dispositive sanction of liability renders them moot. Even if the merits of Manley's issues are considered, moreover, Manley is wrong; it was not entitled to summary judgment or dismissal of the Lanham Act claims.

Manley appealed from a final judgment that awarded Aviva a total of over $8.5 million for disgorgement of Manley's profits, costs and fees on Aviva's successful Lanham Act claims, and multiple unpaid sanctions awards for misconduct. The central issue for this Court is whether the District Court properly exercised its discretion in holding that: (1) Manley's litigation misconduct, including violation of multiple court orders, justified dispositive sanctions; (2) disgorgement was an appropriate remedy for Manley's Lanham Act violations; (3) $6.4 million was an appropriate disgorgement award; (4) Manley's willful conduct makes this an "exceptional case" under the Lanham Act; and (5) the initial monetary sanction awards (which Manley never paid) were appropriate.

Each of those determinations is within the District Court's discretion, and amply supported by the record. Manley offers no viable rationale for finding an abuse of discretion. The District Court exercised extreme patience and restraint in

dealing with Manley's misconduct.  The Court first attempted to secure

compliance through orders requiring compliance, and then through monetary

sanctions, repeatedly warning Manley of more dire consequences for continued

non-compliance.

Unfortunately, Manley's intransigence made those attempts spectacularly

unsuccessful.  Manley never adequately answered Interrogatory No. 8.  Manley

never paid its share of the document production costs of discovery and never paid

the monetary sanctions, despite orders from the District Court specifically warning

Manley of dispositive sanctions for continued noncompliance.  Similarly, the

Court's orders regarding the 30(b)(6) deposition (although not presented as a basis

for dispositive sanctions) were flagrantly disobeyed by Manley.

The District Court properly imposed dispositive sanctions.  Such sanctions

are authorized under Fed. R. Civ. P. 37 for violating discovery orders and also by

the Court's inherent power to manage litigation.  With no other way to ensure

Aviva a fair day in court, the District Court found Manley liable for Lanham Act

violations and barred it from opposing the request for disgorgement, since so much

of Manley's misconduct was designed to hide information relevant to that remedy.

The Court then considered the propriety of disgorgement, finding that both

Manley's unjust enrichment and the egregious and willful nature of Manley's false

advertising and litigation misconduct amply justified disgorgement of a portion of

its ill-gotten profits.  The Court also fashioned an appropriate formula for the award of limited disgorgement damages.

Similarly, the Court evaluated Manley's intentional violations of the Lanham Act in finding that this was an exceptional case, justifying a fee award.

Manley, not surprisingly, disagrees with the Court's rulings.  But it identifies no abuse of discretion.  The District Court acted prudently and patiently, giving Manley many chances (perhaps more than it deserved) to comply.  Manley has never paid the sums it was repeatedly ordered to pay; it has never answered the crucial interrogatory it sought so hard to obfuscate; it continued to rely on delay and dishonesty.

Once the District Court's exercise of discretion on the liability and remedies issues is upheld, as it should be, Manley's other arguments (the bulk of its brief) are moot.  Manley offers a series of technical arguments on the doctrine of prudential standing and on its unsuccessful summary judgment motion, but those interim rulings were not the basis for the Court's judgment.  The Court imposed liability because Manley engaged in an amazing course of litigation misconduct.  It is liable under the Lanham Act because our civil justice system simply could not function if the Manleys of the world were allowed to defy discovery rules and court orders.  To allow Manley to try to escape that liability by rehashing summary judgment arguments would undermine the District Court's authority to manage the

lawsuit and effectively reward Manley's strategy of never complying with the rules or with court orders.

Even if Manley's merits arguments are considered, they fail. Manley claims that Aviva lacked "prudential standing." The doctrine of prudential standing is currently before the United States Supreme Court, but under any view of the doctrine a direct competitor such as Aviva has prudential standing to pursue claims that Manley falsely advertised competing products. Whether the relevant test is determined by the Supreme Court to be the existence of competition, a more complex multi-factor test, or the reasonable-interest test, Aviva has prudential standing.

Similarly, the Court properly denied Manley's motion for summary judgment, based on the evidence of false advertising. Aviva was entitled to the benefit of all reasonable inferences from the record. That record abundantly demonstrated Manley's practice of falsifying its advertisements by increasing the size of its product and miniaturizing pictures of children using the product. Moreover, there was substantial evidence that Manley's false ads, by deceptively making its own product look more desirable, directly harmed Aviva. Although Aviva's proof of its lost profits did not satisfy the District Court, the Court recognized that Manley had harmed Aviva. That is a Lanham Act violation. The Court properly denied summary judgment.

32

## ARGUMENT ON MANLEY'S APPEAL

I.    **The District Court Properly Sanctioned Manley for Litigation Misconduct**.

A.    **Standard of Review**.

The District Court's monetary and dispositive sanctions are reviewed for abuse of discretion. The District Court has "a large measure of discretion in deciding what sanctions are appropriate for misconduct." *Hutchins v. A.G. Edwards & Sons, Inc.,* 116 F.3d 1256, 1260 (8th Cir. 1997).[7] A district court's discretion to impose discovery sanctions is particularly broad. *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.,* 380 F.3d 1084, 1105-1106 (8th Cir. 2004)(This Court will not "substitute our own judgment for that of the district court even though we may have chosen a different sanction had we been standing in the shoes of the trial court.") (citation omitted); *see also Lee v. Max Int'l, LLC,* 638 F.3d 1318, 1320 (10th Cir. 2011)("We view challenges to a district court's discovery sanctions order with a gimlet eye.").

The United States Supreme Court has admonished courts of appeals to beware the "natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order." *Nat'l Hockey League v. Metro. Hockey Club,* 427 U.S. 639, 642 (1976).

---

[7]    For each issue in this brief, this Court applies 8th Circuit law. *See, e.g.*, *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004).

## B.    Both Fed. R. Civ. P. 37 and the Court's Inherent Power Authorize Dispositive Sanctions.

There is no question that the District Court had the authority to impose dispositive sanctions. Rule 37(b)(2)A authorizes "further just orders" when a party disobeys "an order to provide or permit discovery." This includes "prohibiting the disobedient party from … opposing designated claims" and rendering a default judgment. *Id*. at subparts ii and vi.

More broadly, the inherent power to manage litigation includes the power to impose dispositive sanctions against parties who persistently refuse to comply with procedural rules and court orders. A court may "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Such sanctions may be imposed against a litigant acting in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.; see also Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999) (affirming default judgment "[w]hen a litigant's conduct abuses the judicial process, . . . dismissal of a lawsuit [is] a remedy within the inherent power of the court.") (quotation omitted).

The sanction must be "just" and relate to the claim at issue. *Hairston v. Alert Safety Light Prods., Inc.*, 307 F.3d 717, 719 (8th Cir. 2002) (quoting *Avionic Co. v. Gen. Dynamics Corp.*, 957 F.2d 555, 558 (8th Cir. 1992)). "[S]o long as [the Court] considers whether a lesser sanction is available or appropriate," it need not

impose the least severe sanction. *Brennan v. Qwest Comm's Int'l, Inc.*, 2009 WL 1586721, at *7 (D. Minn.) (citing *Keefer v. Provident Life & Accident Ins. Co.*, 238 F.3d 937, 941 (8th Cir. 2000)).

One purpose of dispositive sanctions is to protect the civil justice system as a whole, by deterring not only the particular party in question but also all parties to all cases. In *Nat'l Hockey League*, the Supreme Court expressly cautioned courts of appeal against reversing dispositive sanctions in the belief that a "duly chastened" party would henceforth "comply promptly with future discovery orders of the district court." 427 U.S. at 642-43. Such reversals are inappropriate:

> [T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*Id.* at 643. As described below, the District Court in this case exercised its discretion prudently and cautiously and should be affirmed.

### C. **Manley Willfully Violated Court Orders, Prejudicing Aviva**.

Manley's misconduct easily meets the three factors that support dispositive sanctions: "'(1) an order compelling discovery; (2) a willful violation of that order; and (3) prejudice to the other party.'" *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 817 (8th Cir. 2001) (quoting *Keefer,* 238 F.3d at 940); *see also Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000); *Forsythe v. Hales*, 255

F.3d 487, 490 (8th Cir. 2001) ("Default judgment is appropriate where the party against whom judgment is sought has engaged in 'willful violations of court rules, contumacious conduct, or intentional delays'") (quoting *Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 856 (8th Cir. 1996)).

When the facts show willfulness, the District Court need not investigate the propriety of a less extreme sanction. *Hairston*, 307 F.3d at 719; *Hunt v. City of Minneapolis, Minn.,* 203 F.3d 524, 527 (8th Cir. 2000) ("This does not mean that the district court must find that the appellant acted in bad faith, but requires 'only that he acted intentionally as opposed to accidentally or involuntarily.'") (quoting *Rodgers v. Univ. of Mo.,* 135 F.3d 1216, 1219 (8th Cir. 1998)).

There is no doubt that Manley violated the District Court's orders with respect to interrogatories, document production, depositions, and payment of sanctions. Moreover, this was an extreme case. The District Court had "rarely encountered a represented litigant so adverse to following the Court's orders." A175.

With regard to interrogatories, the Court ordered Manley to provide an adequate answer to Interrogatory No. 8, which Manley had failed to do. Aviva sought detailed financial information about the Manley products in question, to facilitate damages calculations. Instead of providing the information, Manley inappropriately invoked Rule 33(d), permitting a party, *under appropriate*

*circumstances*, to rely on its document production to supply the answer to the interrogatory. Rule 33(d) "requires first that the information actually be obtainable from the documents." *In re Sulphuric Acid Antitrust Litig.*, 231 F.R.D. 320, 325 (N.D. Ill. 2005). The party invoking the rule must demonstrate (1) substantial equivalency of burdens on the requesting and responding parties of deriving an answer; and (2) a sufficiently detailed specification to permit the requesting party to find the documents as readily as the responding party. *Id.* "[R]eferring to business records *en masse*, without specifying particular documents is 'abuse of the option [provided by Rule 33(d)]'" *Id.* (quoting *Bonds v. District of Columbia*, 93 F.3d 801, 811 (D.C. Cir. 1996) (other citations omitted); *see also Bayview Loan Serv., LLC v. Boland*, 259 F.R.D. 516, 519 (D. Colo. 2009) (requiring party to identify specific documents to comply with Rule 33(d)); *Cambridge Elec. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 323 (C.D. Cal. 2004) (general reference to 28 boxes of documents insufficient); *O'Connor v. Boeing N. Am.*, 185 F.R.D. 272, 277-278 (C.D. Cal. 1999) ( "[R]ule 33(d) is not satisfied by the wholesale dumping of documents.")

When the District Court ordered Manley to comply by specifically identifying the relevant documents from which an actual answer could be derived, Manley violated the order by simply listing vast quantities of largely irrelevant documents. Manley first identified half a million documents, then 44,000, without

any specific information on how to derive the interrogatory answer. On the eve of a hearing on Aviva's motion for dispositive sanctions, Manley submitted another supplemental answer, which *still* failed to satisfy the requirements in the Court's order. Manley never really answered this key interrogatory.

Manley also violated the Court's orders relating to the production of documents, issued after Manley's counsel consistently abdicated a lawyer's responsibilities by blindly relying on its thoroughly unreliable client with respect to production. Counsel "may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances." Fed.R.Civ.P. 26(g) Adv. Com. Notes, 1983 Amendments. But "[b]lind reliance on the client is seldom a sufficient inquiry." *In re Kunstler*, 914 F.2d 505, 514 (4th Cir. 1990) (quoting *Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986)); *see also Rottlund Co., Inc. v. Pinnacle Corp.*, 222 F.R.D. 362, 383 (D. Minn. 2004) ("attorney never searched for or reviewed [the client's] files/documents at the ground level.… counsel's failure to roll-up its sleeves and search for documents in the first instance greatly contributed to the failure to conduct a reasonable inquiry.")(*Report and Recommendation adopted in part, rejected in part on other grounds*, 2005 WL 407860 (D. Minn., Feb. 17, 2005)).

Manley committed a host of sins during the document production process.

Its counsel failed to exercise any meaningful supervision of the process. It provided inaccurate information. It moved documents out of the United States and sent them to China shortly before they were to be produced. Ultimately, Manley's misconduct caused the Court to order it to share the cost of document production with Aviva. Previously, Aviva had agreed to pay the entire cost, based on Manley's inaccurate representations about the scope of the production.

Manley violated repeated orders to pay its share. As the District Court eventually determined, this was a strategy designed to exhaust Aviva's resources and force it to drop the case. A22. Thus, disobedience of the order to pay the share of copying costs not only constituted defiance of the order; it was a tactical strategy designed to thwart discovery as to both liability and damages.

The Court imposed monetary sanctions in addition to the reallocation of copying costs, but Manley violated those orders as well. It never paid any of the monetary sanctions.

Finally, although not directly a part of the dispositive sanction process, Manley continued its pattern of disobedience by violating the order requiring compliance with the 30(b)(6) deposition process.[8] Manley was required to make a "conscientious, good-faith effort to designate knowledgeable persons for Rule

---

[8] Manley violated the witness preparation order *after* the dispositive sanctions issue had been submitted to the District Court, so it was not part of the basis for the dispositive sanctions.

30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Dwelly v. Yamaha Motor Corp.*, 214 F.R.D. 537, 540 (D. Minn. 2003) (quotation omitted). At least one District Court has found it to be sanctionable conduct for an attorney to prepare a "script" from which a deponent reads in response to questions posted by adversary counsel during a deposition. *Briese Lichttechnik Vertriebs GmbH v. Langton*, 2011 WL 280815 at **7, 9 (S.D.N.Y.) (condemning as "still more bizarre, the use of written statements, apparently prepared by counsel, which he gave to the witness to read into the record as supposed answers to questions posed by plaintiffs' attorney."); *see also Cont'l Cas. Co. v. Compass Bank*, 2006 WL 533510 at *17 (S.D. Ala.) ("[f]ailure to appear at [a] deposition sanctionable under Rule 37(d)(1) includes those circumstances in which a 30(b)(6) corporate designee appears at deposition unprepared to testify.").

Manley began by producing a clearly unprepared witness. When the Court ordered Manley to provide a better-prepared witness, Manley instead produced a much more poorly prepared witness. Mr. Toth knew nothing about the facts and topics on which he was asked to testify, other than a few scripted answers provided by Chinese counsel.

Manley's defiance was willful. This is clear from the repeated failure to comply with so many orders, over a considerable period of time, and despite

numerous additional chances offered by the Court.  The Court certainly found

willfulness:  "Manley has intentionally disobeyed every Order, has never offered

any viable excuse for its willful conduct."  A119.

 The Court also properly found that "Aviva has been irreparably prejudiced

in its ability to prepare for trial by the drain on its resources."  A12.  More

specifically, Aviva never got a proper answer to Interrogatory No. 8; it never

received payment of Manley's share of discovery costs; and "Aviva's inability to

produce such [damages] evidence was likely compounded by Manley's intentional

and egregious misconduct and brazen refusal to provide any meaningful discovery

on that subject."  A13.

### D. <u>The District Court Showed Great Patience and Caution Before Imposing Dispositive Sanctions</u>.

 Despite Manley's provocative defiance, the District Court refused to act

precipitously.  When Manley first violated the Court's January 3, 2012 order

requiring Manley to reimburse Aviva for half of the document production costs,

the Court reiterated and clarified that order on May 9, 2012, so that there would be

no misunderstanding that Manley was required to pay by a specified date.  When

Manley still did not pay, the Court issued a further order on June 15, requiring

payment.  A150-A155.  The Court also expressly warned Manley of the risk of

dispositive sanctions.  A155.  Similarly, the Court issued orders on the attorney's

fee sanctions on September 6 and 7, again specifically requiring payment by a

certain date and clearly warning Manley that noncompliance would have additional consequences.  A165-A176, A177-A184.

The Court repeated this attempt to gain compliance with regard to Interrogatory No. 8, ordering Manley to submit a fully responsive answer and warning it to comply or risk additional sanctions.  But none of this worked.  By the end of 2012, Manley had not paid the monetary amounts ordered by the Court, nor had it submitted an adequate answer to Interrogatory No. 8.

Only then, on January 8, 2013, did the Court impose a dispositive sanction, analyzing Manley's history of noncompliance and the Court's efforts to secure that compliance.  The Court expressly noted that Manley's history left if no choice but to impose a more severe penalty of dispositive sanctions.  "The measures the Court has taken to secure Manley's compliance with its Orders have proven utterly ineffective.  Manley seems impervious to monetary sanctions."  A222.

### E.     Manley Has No Valid Objection to the Dispositive Sanctions.

Manley offers no viable objections to the dispositive sanctions.  Indeed, it is difficult to discern what Manley's opposition is, beyond a general wish that the Court had been even more lenient.  That is no basis to attack a District Court's discretionary imposition of dispositive sanctions.

Manley also complains that it is improper to impose dispositive sanctions for failure to obey discovery orders relating to the payment of money.  There are at

least three reasons why this is not correct.

First, the District Court was explicit that the dispositive sanctions were being imposed not *just* for the failure to pay money, but for Manley's entire course of conduct, which included, *e.g.*, withholding critical financial and damages-related information by never answering Interrogatory No. 8.

Second, to the extent Manley contends that it was *unable* to pay the sanctions, the Court reviewed Manley's proffered excuse and definitively rejected it. A152. Manley did not even pay the smaller attorney's fee sanctions (one as low as $3,000) that were also ordered. Moreover, Manley itself stated its near certainty that it would be able to pay by September, 2012 (three months after the Court's final deadline). A10870. As the Court noted, Manley did not meet even its own self-imposed (and belated) deadline for payment. In addition, Manley's sales and profits dwarfed the amounts it was ordered to pay by the District Court. From 2003 to 2011, Manley had sales of over $90 million and profits in excess of $27 million on the falsely advertised products alone. A22-A23. Manley's claim that it could not pay simply is not true.

Third, failure to pay discovery sanctions or other monetary awards does support the imposition of dispositive sanctions. Defiance of any court order (absent a stay or other legal excuse) is wrong. As the Supreme Court stated in *Maness v. Meyers*, 419 U.S. 449, 458 (1975):

> We begin with the basic proposition that all orders and judgments of
> courts must be complied with promptly. . . . Persons who make private
> determinations of the law and refuse to obey an order generally risk
> criminal contempt even if the order is ultimately ruled incorrect.

More specifically, *Haskins v. Lister*, 626 F.2d 42 (8th Cir. 1980), affirmed entry of

default judgment against a party that ignored the court's discovery-related orders,

including orders to pay attorney's fees and costs for discovery violations. *See also*

*Peter Kiewit Sons', Inc. v. Wall Street Equity Grp., Inc.*, 2013 WL 1914912, at *2

(D. Neb.) (default judgment after "monetary sanctions and an inference of

spoliation have already been deployed in this case to little effect."); *Tax Servs. of*

*Am., Inc. v. Mitchell*, 2008 WL 2756950, at *4-5 (D. Colo.) (dispositive sanction

after magistrate had issued "no less than nine Orders related in some way to

Defendant's neglect of his discovery responsibilities," including monetary

sanctions).

Imposing dispositive sanctions for non-payment is particularly appropriate

here, where Manley's failure to pay was part of its strategy to "vexatiously protract

litigation until the plaintiff has exhausted its resources." A22. Through its

outrageous behavior in connection with the document production, Manley required

Aviva to pay nearly half a million dollars simply to copy and ship documents from

China to the United States. The Court ordered Manley to bear half of this cost by

reimbursing Aviva $238,000. Manley's refusal was discovery misconduct,

because it deprived Aviva of resources for carrying on the litigation. There is no

44

reason why defiance of a court order to pay money should be less sanctionable than defiance of any other order.

**F.  The District Court Properly Exercised Its Discretion In Imposing Monetary Sanctions Against Manley For Litigation Misconduct**.

Manley also offers no viable attack on the underlying monetary sanctions the Court first imposed on Manley.  Manley does point out, regarding the order to pay half of the document production costs, that Aviva had previously agreed to bear all of those costs.  Of course, this was prior to learning of Manley's misconduct in connection with the Chinese production, which greatly inflated the amounts Aviva was required to pay.  Once Aviva learned just how badly Manley had misbehaved, it asked the District Court to reconsider the question of sharing the costs, and the District Court found ample grounds for ordering those costs to be split.  Manley offers no reason why that was an abuse of the District Court's discretion.  All of the monetary sanctions are fully justified.

**II.  The District Court Properly Awarded Aviva $6.4 Million as a Disgorgement Remedy**.

**A.  Standard of Review**.

The imposition and calculation of disgorgement is reviewed for abuse of discretion.  *S.E.C. v. Lawton*, 449 F. App'x 555, 556 (8th Cir. 2012) (citing *S.E.C. v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir. 2004)).

**B.  Disgorgement Is An Available Lanham Act Remedy**.

Disgorgement of the wrongdoer's profits is one available remedy under the

Lanham Act, "subject to the principles of equity." 15 U.S.C. §1117(a) (2006).

The amount of disgorgement is expressly a matter for the court's discretion:

> If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

*Id.* The two primary equitable principles at stake are "to deter would-be infringers and to safeguard against unjust enrichment." *Masters v. UHS of Del., Inc.,* 631 F.3d 464, 473 (8th Cir. 2011).

Because the remedy seeks to deter infringers and avoid unjust enrichment, a plaintiff may recover even absent a showing of actual damages. While "[a]n award of monetary relief under the Lanham Act must be compensatory, not a penalty[,] … [i]t does not follow … that a finding of damages is a precondition of any monetary award." *Id.* at 474 (citations omitted); *see also Safco Prods. Co. v. Welcom Prods., Inc.*, 799 F.Supp.2d 967, 994 (D. Minn. 2011) ( "the fact that [the claimant] has not – and apparently cannot – support a claim of any actual damages would not necessarily warrant summary judgment.")

Moreover, disgorgement is not necessarily limited to profits earned *because of* the false advertising. "[T]he district court is given broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty." *Metric & Multistandard Components Corp. v Metric's Inc.,* 635 F.2d 710, 715 (8th Cir. 1980). A court may award any amount of

46

profits necessary to deter willful violations of the Lanham Act, and a plaintiff is

not necessarily limited to "relief from the infringement only to the extent that [the

defendant] had been unjustly enriched." *Truck Equip. Serv. Co. v. Fruehauf Corp.*,

536 F.2d 1210, 1222 (8th Cir. 1976) (approving award of all profits from all sales

of the violative products to deter willful infringement).

Factors for a district court to consider on disgorgement include defendant's

intent to confuse or deceive, whether sales have been diverted, the adequacy of

other remedies, and the public interest in making misconduct unprofitable. *See*

*Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006); *Banjo*

*Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005); *Quick Techs., Inc. v.*

*Sage Grp. PLC,* 313 F.3d 338, 349 (5th Cir. 2002). Under some circumstances, the

egregiousness of the defendant's conduct "may, of its own, justify an accounting."

*George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2d Cir. 1992).

Manley's primary argument is that disgorgement is improper here because

Aviva allegedly suffered no harm. This misstates both the law and the facts.

As noted above, disgorgement is available even where the plaintiff cannot

prove a specific amount of the plaintiff's own lost profits. Manley is not entitled to

profit from its wrongdoing, simply because Aviva had difficulty meeting the

higher standards of causation for lost profits damages.

Given that legal landscape, Manley misstates the Court's holding with

regard to harm to Aviva.  The Court never found that Manley's false advertising was harmless.  Instead, the Court simply determined that Aviva did not prove up a specific amount of Aviva's own lost profits caused by Manley's false advertising. *See* A47 ("Aviva must be able to prove that its losses were caused by Manley's alleged misconduct.").  As a direct competitor of Manley, and given the clear evidence that Manley's false ads gave it an illegitimate advantage in the marketplace, it is inconceivable that Aviva was not harmed.

The Court recognized that the record showed that Aviva had been harmed, and it calculated a limited disgorgement remedy based on the record.  *See* A24 ("[t]he Court has taken pains to avoid a disgorgement award that would constitute a windfall.").

Manley also argues that Aviva cannot obtain disgorgement because it exited the inflatable slide and pool business in 2012.  No case so holds, and there is no logic to that argument.  Manley relies on a comment that Justice Scalia made in *dissent*, where he contended that civil penalties (not disgorgement) should be limited to preventing future harm to the plaintiff.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 212 n. 5 (2000).  His view was squarely rejected by *the majority*, which reasoned that "[t]o the extent that [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or

48

threatened with injury as a consequence of ongoing unlawful conduct." *Id.* at 706-07. The majority found that this principle was not limited to civil penalties, but applied to any "sanction that effectively abates that conduct and prevents its recurrence." *Id.* at 706.

Here, as the District Court recognized, its disgorgement award operated "to deter Manley from such conduct in the future." A22. Aviva's exit from the market does not obviate the need to deter future wrongdoing by Manley, and disgorgement is an appropriate means of reaching that goal. In any event, the District Court's calculation awarded Aviva a share of Manley's profits only for the period (2003-11) when Aviva actively competed with Manley.

Manley's argument is also illogical, because it would reward a really successful false advertiser. As the Court noted, Aviva's own business had been "smothered . . . in its crib" by Manley. A24. Aviva exited the business when it could not successfully compete with Manley's false advertising. To reward Manley for driving Aviva from the marketplace would be a terrible injustice.

**C.    The District Court Appropriately Applied the Relevant Factors to Impose a Disgorgement Remedy on Manley.**

Even though Manley was properly barred from opposing disgorgement below, the District Court itself carefully considered the relevant factors. The Court analyzed Manley's history of intentional and outrageous false advertising. There was abundant evidence of Manley's intent to confuse or deceive the public.

For example, Aviva's expert witness, Dr. David Krauss, used anthropometric data and mathematical formulas to determine the extent to which images of different children were manipulated relative to the Manley product being advertised. He concluded that many of Manley's advertised images misrepresent the size of the products.

Aviva also presented the testimony of Harris and Kallemeyn, detailed in the Statement of the Case, *supra*. They were *instructed* by Manley to falsify the images, and to do so as a standard practice. This was a two-stage process: the product itself was falsified through the use of a specially made, larger version, and then children's pictures were falsified, through reduction and photoshopping. Manley product managers knew that was "physically impossible" to put as many children in the actual pool as were pictured. A9913.

Kallemeyn got to the heart of the matter: "what we were doing is – is, you know, lying to people." A9917.

Manley knew all of this. Its personnel in Hong Kong received all of the doctored advertising images and sometimes performed the work; all of the files would be sent to Manley in Hong Kong where Manley would do the "final artwork." A18.

The District Court found that Manley acted deliberately, continuing its false advertising even after learning of consumer complaints. A19. The Court further

found that there was a need to deter Manley from further false advertising and that only disgorgement could properly accomplish this purpose.  A22.

The Court also found that Manley was unjustly enriched by the false advertising, to the tune of approximately $17.85 million.  A24.

Finally, the Court held that Aviva diligently acted as the "'vicarious avenger' of consumer rights" in bringing these claims.  *See Porous Media Corp. v. Pall Corp.,* 110 F.3d 1329, 1335 n.8 (8th Cir. 1997).  Aviva persisted, despite Manley's tireless attempts to evade discovery and obstruct the judicial process. The Court refused to deny disgorgement relief after Aviva painstakingly pursued its claims and continually battled Manley's abusive litigation tactics.

The Court recognized that to deny disgorgement would "send a message that a defendant can avoid liability for deceptive false advertising if it can vexatiously protract litigation until the plaintiff has exhausted its resources."  A22.  The Court quite properly declined to send that message.  *Cf. Maier Brewing Co. v Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968) ("It seems scarcely equitable … for an infringer to reap the benefits of a trade-mark he has stolen, force the registrant to the expense and delay of litigation, and then escape payment of damages on the theory that the registrant suffered no loss.  To impose on the infringer nothing more serious than an injunction when he is caught is a tacit invitation to other infringement."  (quotation omitted)).

Without disgorgement, there would have been no meaningful remedy for the extreme bad acts Manley used to profit through lying and deception. The Court properly ordered Manley to surrender a portion of its ill-gotten profits.

D. **The District Court Appropriately Set the Disgorgement Amount**.

The Court properly exercised its discretion in calculating the disgorgement award. The Court relied in part on a market research study showing that consumers were far more likely to purchase Manley products when exposed to the false ads, and far less likely to purchase the competing Aviva product. Using the percentage of consumers whose decisions were affected in that study, the Court computed the total amount of Manley profits attributable to false advertising, adjusted it to remove profits from Target stores (because Aviva had unique issues there) and awarded Aviva the percentage of that amount represented by the market share Aviva would have had if Manley had advertised honestly. This was an appropriate methodology well within the District Court's discretion.

Manley claims that the risk of duplicative damage awards should have prohibited disgorgement. That is not the law. A concern about the *possibility* of duplicative awards is one of the reasons why courts are careful when awarding disgorgement. *See Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1172 (11th Cir. 2007) (discussing the "risk" of multiple claims). But it has never constituted a complete bar to disgorgement. Moreover, the formula the Court used

here prevents duplication.  It limited the disgorgement award to Aviva's own share

of the market.  Other market participants could seek *non-duplicative* disgorgement

awards from Manley (based on their own market share) if they so choose.  Finally,

Manley cites two pending cases which it claims pose a risk of duplicative awards.

However, those cases (*Adams v. Target Corp.*, No. 13-CV-5944 GHK (C.D. Cal.

2013), *Chavez v. Wal-Mart Stores, Inc.*, No. 13-CV-6429 GHK (C.D. Cal. 2013)),

are not against Manley.  They are claims against retailers by consumers only.

There is no risk of a duplicative award against Manley from those cases.

### III.  The District Court Properly Awarded Aviva a Portion of its Attorney's Fees and Costs Under the Lanham Act.

#### A.  Standard of Review.

A fee award under the "exceptional case" provisions of the Lanham Act is

reviewed for abuse of discretion.  *Cmty. of Christ Copyright Corp. v. Devon Park*

*Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1013 (8th Cir. 2011).

#### B.  The Lanham Act Authorizes Attorney's Fee Awards In "Exceptional Cases."

The Lanham Act expressly provides for reasonable attorney's fees to the

prevailing party in "exceptional cases."  *Fair Isaac Corp. v. Experian Info*

*Solutions, Inc.,* 650 F.3d 1139, 1152 (8th Cir. 2011) (quoting 15 U.S.C. § 1117(a)).

"[A]n exceptional case is one in which the plaintiff's action was groundless,

unreasonable, vexatious, or pursued in bad faith."  *Id.*  The 8th Circuit has held that

"when a defendant's unlawful conduct 'was willful and deliberate, the court may

well determine that this is the type of 'exceptional' case for which an award of attorney's fees is appropriate.'" *Cmty. of Christ Copyright Corp.,* 634 F.3d at 1013.

The Court found this to be an exceptional case because of Manley's willful and intentional false advertising. A25. It awarded Aviva a portion of the fees Aviva incurred on its Lanham Act claims, as well as certain costs.

Manley does not challenge the Court's finding of intentional false advertising. It relies instead on an inapplicable technical defense, claiming that Aviva cannot be the "prevailing party," because it did not prevail in its claims against the Retailer Defendants. Manley's defense fails.

First, the cases Manley cites refer to the award of costs (not fees) under Fed. R. Civ. P. 54(d)(1) to the prevailing party. Those cases do not address the "exceptional case" provision of the Lanham Act, which expressly authorizes attorney's fees in an exceptional case, with no mention of the fate of other claims against unrelated parties.

Second, Manley appears to concede that the District Court can select who the prevailing party is, in a case with mixed results. Here, the Court has clearly recognized that Aviva, which prevailed against a blizzard of litigation misconduct by Manley, rightfully deserves recognition as the prevailing party.[9]

---

[9] Manley does not challenge the amount of the fee award.

54

**IV.** **Manley's Arguments Regarding Lanham Act Liability are Moot, Given the Dispositive Sanctions**.

    **A.** **Standard of Review**.

The mootness issue did not arise until this appeal, when Manley attempted to argue that prudential standing and lack of evidence somehow constituted a defense to the dispositive sanctions liability finding. This Court should assess mootness *de novo*. *See, e.g., Keup v. Hopkins*, 596 F.3d 899, 904 (8th Cir. 2010).

    **B.** **The Dispositive Sanctions Moot Manley's Substantive Liability Arguments**.

Manley's main arguments on appeal are that it should have prevailed below, based on prudential standing and/or whether Aviva presented sufficient evidence in opposition to Manley's summary judgment motion on the Lanham Act claims. But Manley never addresses why those issues are even relevant. The District Court did not assess Lanham Act liability against Manley based on a determination of the merits; it imposed a *default* judgment of liability as a sanction for misconduct. In other words, the basis of liability is Manley's misconduct, and Manley's rehashing of the prudential standing and summary judgment issues argued below do not address the actual basis for the District Court's judgment in favor of Aviva.

The imposition of a default judgment or other dispositive sanction renders summary judgment or similar issues moot. *See, e.g., Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.,* 561 F.3d 1298, 1308 (11th Cir. 2009) ("Because we hold that the sanctions and the default judgment were not improper, Appellants'

remaining challenges to the district court's interlocutory rulings are moot.");

*Shcherbakovskiy v. Seitz*, 2011 WL 6185446, at *2 (2d Cir.) ("[A]ppellant's

remaining arguments . . . [are] without merit or to be moot"); *In re Wechsler,* 121

F.Supp.2d 404, 431 (D. Del. 2000) ("Given the nature of this court's ruling on the

motions for sanctions, Wechsler's motion for summary judgment will be denied as

moot").

The converse is equally true. Even the grant of summary judgment does not

render moot a motion for sanctions against the prevailing party. *See Johnson v.*

*Ventra Group, Inc.,* 191 F.3d 732, 749 (6th Cir. 1999). More generally, denial of

summary judgment is generally moot once the case has been decided at trial.

*Cowan v. Strafford R-VI School Dist.*, 140 F.3d 1153, 1157 (8th Cir. 1998);

*Johnson Intern. Co. v. Jackson Nat. Life Ins. Co.*, 19 F.3d 431, 434 (8th Cir. 1994).

This is the only logical outcome. The whole point of a ***default*** judgment is

that the court is imposing liability without reaching the merits. If a party has been

defaulted for failing to file a timely answer, the court does not allow that party to

pursue its affirmative defenses on appeal. The only question is whether the default

judgment itself was properly imposed.

The policy behind dispositive sanctions makes it imperative that substantive

defenses to liability be moot. If Manley could evade liability based on its merits

defenses, the "dispositive sanctions" would be neither dispositive nor sanctions.

Instead, they would have no effect at all.  Manley would thumb its nose at the

District Court's just imposition of sanctions.  That would not only reward Manley

in this case, it would, as the Supreme Court stated in *Nat'l Hockey League*, broadly

undermine the administration of justice:

> But other parties to other lawsuits would feel freer than we think Rule
> 37 contemplates that they should feel to flout other discovery orders
> of other district courts.

427 U.S. at 643.

Manley richly deserved the dispositive sanctions imposed below and cannot

be allowed to evade the consequences of its bad acts.  Its merits defenses are moot.

**V.     Manley Was Not Entitled to Prevail on its Motions to Dismiss or for Summary Judgment on Prudential Standing and Lanham Act Liability**.

**A.     Standard of Review**.

The 8th Circuit reviews standing rulings *de novo*.  *St. Paul Area Chamber of

Commerce v. Gaertner*, 439 F.3d 481, 484 (8th Cir. 2006).  Summary judgment is

only appropriate when the evidence, viewed in the light most favorable to the

nonmoving party, presents no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law.  *Coates v. Powell*, 639 F.3d 471, 475

(8th Cir.2011).  Determinations as to the admissibility of evidence lie within the

sound discretion of the District Court, and the 8th Circuit reviews those

determinations for abuse of discretion.  *Brunsting v. Lutsen Mountains Corp.*, 601

F.3d 813, 818 (8th Cir. 2010).

**B.** **The District Court Properly Held That Aviva Has Prudential Standing Against Manley, a Direct Competitor of Aviva**.

Manley challenges the District Court's denial of its motion to dismiss for lack of "prudential standing." A1404-A1406. But Aviva is Manley's direct competitor. Aviva and Manley vied for the same consumers, and competed virtually side-by-side on the same websites of the same retailers. Because Aviva has alleged precisely the type of injury against the type of defendant that the Lanham Act is designed to address, this Court should affirm Aviva's standing under the Lanham Act.

A Lanham Act plaintiff must demonstrate both constitutional and prudential standing. *Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103 (8th Cir. 2006). Manley does not dispute that Aviva had constitutional standing. Prudential standing law is currently in flux; the federal circuits are split between three different tests; the 8th Circuit has not fully endorsed any of them. Most recently, in early December 2013, the United States Supreme Court heard oral arguments on the proper test for prudential standing in *Static Control Components, Inc. v. Lexmark Int'l, Inc.*. The Court's decision in *Lexmark*, likely due in Spring 2014, will presumably set a nationwide standard for prudential standing under the Lanham Act.

Unless the Supreme Court devises a new and more restrictive test, however, *Lexmark* is unlikely to affect the ultimate result in this case, for Aviva has

58

prudential standing under the Lanham Act under any of the existing tests.

### 1.   The Conte Bros. Test

Manley analyzes only the five-factor test in *Conte Bros. Automotive, Inc. v.*

*Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir. 1998):

| | | |
|---|---|---|
| (1) | Is the injury of a type that Congress sought to redress? |
| (2) | The directness or indirectness of the asserted injury. |
| (3) | The proximity or remoteness of the party to the alleged injurious conduct. |
| (4) | The speculativeness of the damages claim. |
| (5) | The risk of duplicative damages or complexity in apportioning damages. |

*Id.* at 233.  Manley concedes that Aviva satisfies the first and third factors.

(Manley Br. at 32.)  Regarding the second factor—directness—Aviva has a classic

basis for false-advertising prudential standing:  Manley's "literally false

advertising about its own goods influenced its customers to buy its products

instead of [the plaintiff]'s product."  *Harold H. Huggins Realty, Inc. v. FNC, Inc.*,

634 F.3d 787, 799 (5th Cir. 2011) (footnotes omitted).  Aviva's false advertising

injury is paradigmatic:  Manley ran false ads; those ads caused customers to buy

Manley's products instead of Aviva's products; and Aviva suffered economic

injury.

The District Court's ruling that Aviva failed to prove its own lost profits is a

separate issue, irrelevant to prudential standing. As the District Court explained, a Lanham Act plaintiff *seeking damages* is required to "prove both actual damages and a causal link between defendant's violation and those damages." A45. (quoting *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996)). But on the issue of standing, the *Conte Bros.* test considers the directness or indirectness of the *asserted* injury. *Conte Bros.*, 165 F.3d at 233.

The District Court here concluded on summary judgment that Aviva had sufficient evidence of a likelihood of injury to support injunctive relief and disgorgement. Even if the *lost profits* Aviva sought were unproven (in part because Manley withheld key evidence in discovery), Aviva still suffered competitive harm from Manley's false ads.

The final *Conte Bros.* factor, the risk of duplicative or difficult-to-apportion damages, also favors standing. Aviva's claims could be asserted only by other waterslide manufacturers, and Court's limited disgorgement remedy dealt only with Aviva's own market share. Other manufacturers could still obtain *non-duplicative* relief. Conferring standing on parties like Aviva furthers the Lanham Act's underlying purpose by "ferret[ing] out unfair competitive methods and protect[ing] businesses from the unjust erosion of their good will and reputation." *Conte Bros.*, 165 F.3d at 236.

### 2.    **The Categorical Test**

The Categorical Test requires a false-advertising plaintiff to show that:

1) Plaintiff competes with the defendant in some marketplace;

2) Plaintiff has alleged a discernible competitive injury resulting from a misrepresentation in the marketplace; and

3) The misrepresentation implicates some purpose of the Lanham Act.

*Kournikova v. Gen. Media Commc'ns Inc.*, 278 F.Supp.2d 1111, 1117 (C.D. Cal. 2003).   This test was recognized (but not adopted) by the 8th Circuit in *Am. Ass'n. of Orthodontists*, 434 F.3d at 1104.

Aviva competed in the same marketplace as Manley, selling waterslides at the same retailers and to the same consumers.  Aviva also complains of a known competitive injury: customers who viewed Manley's misleading ads were less likely to purchase Aviva waterslides than customers who viewed accurate ads. (*See* A42-A43.)  Finally, Aviva's claims implicate the Lanham Act's purpose of protecting business and ferreting out unfair competition.  *Conte Bros.*, 165 F.3d at 236.

### 3.    **Reasonable-Interest Test**

The final test of Lanham Act standing is the Reasonable-Interest test:

1)   A reasonable interest to be protected against the alleged false advertising; and

2)   A reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising.

*Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 113 (2d Cir. 2010). This

test is was discussed extensively in the briefing and Supreme Court oral argument

of *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 410-11

(6th Cir. 2012), *cert. granted* 133 S.Ct. 2766 (June 3, 2013) (No. 12-873).

Aviva sought judicial protection from Manley's false advertising. Its

paradigmatic false-advertising claim was animated by a reasonable belief—

supported by evidence—that consumers were misled into buying Manley's

products over Aviva's products.

Because Aviva meets the elements of each of the three tests for Lanham Act

prudential standing, this Court should affirm the District Court's denial of

Manley's motion to dismiss.

### C.     The District Court Properly Denied Manley's Summary Judgment Motion, Based on Highly Disputed Facts.

#### 1.     The District Court Properly Relied on Circumstantial Evidence at Summary Judgment

Manley complains that summary judgment was denied, in part because

Aviva did not offer direct evidence of the falsity of advertisements for each

product in question. As a matter of law, the District Court was under no obligation

at the summary judgment stage to require direct evidence of a Lanham Act

violation *for each of the accused products*. The District Court properly rejected

this notion, explaining that "similar advertisements in similar formats involving

similar types of alleged misrepresentations" may be relied upon by the factfinder when comparing misrepresentations on similar products. A34. "To find otherwise would completely ignore the role of circumstantial evidence." (*Id.*)

The 8th Circuit law allows "the nonmoving party [to] draw upon favorable inferences from circumstance [sic] evidence to defeat summary judgment." *Do v. Wal-Mart Stores*, 162 F.3d 1010, 1013 (8th Cir. 1998). Contrary to Manley's assertions, Aviva did not fail to "prove up" false advertising. Aviva showed that Manley employed one deceptive tactic—manipulating photos to misrepresent the size of its products—and it used that tactic over and over again on its products. The District Court properly relied on circumstantial evidence to deny summary judgment.

## 2.    Aviva Provided Evidence of Literal Falsity

Manley objects to the District Court's ruling that a jury could find ads to be literally false under the Lanham Act. A39. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998) (describing literal falsity). That ruling was correct.

Manley does not deny that it manipulated its advertising. Instead, Manley takes the meritless position that the testimony of Harris and Kallemeyn (two witnesses who actually helped create the false ads under Manley's direction) is inadmissible because of the "logical gap" between the images they helped create

and the actual product packaging. (Manley Br. at 32.) This supposed "gap" is nothing more than a disputed factual issue. In light of the direct knowledge the witnesses had of Manley's deceptive advertising, the District Court did not abuse its discretion in relying on their testimony to deny summary judgment.

Harris and Kallemeyn prove literal falsity. "[E]ven a visual image . . . may be literally false." *United Indus. Corp.*, 140 F.3d at 1181. Manley's images were deceptive. Consumers were fooled into thinking the waterslides were larger than they were. The District Court correctly concluded that "a jury could reasonably conclude that if the images misrepresent the size of the product, then the advertisement as a whole is literally false." A40.

Manley's objections to the testimony of Dr. Krauss are also unavailing. His testimony helped show that many Manley packages misrepresent the size of the products. A40. The District Court properly admitted this evidence to establish Manley's practice of manipulating images. Moreover, Dr. Krauss's examination of 62 of the original 95 accused products provided circumstantial evidence forming the basis of sound inferences for each of the products.

### 3.  <u>Aviva Provided Evidence of Materiality</u>

Manley's deception met the Lanham Act's materiality element. Two consumers testified that the picture on the packaging influenced their decision to purchase a Manley product. A41-A42. The Court also cited the expert testimony

of Hal Poret, who performed the consumer study showing that customers shown a deceptive Manley image were less likely to buy an Aviva product than a consumer who viewed an accurate image. A42. The District Court deemed Poret's testimony relevant and reliable, and determined that it can "reasonably provide circumstantial evidence of materiality with respect to the other Manley products that were not included in this study." A43.

The District Court properly rejected Manley's argument that *Am. Home Prods. Corp. v. Proctor & Gamble*, 871 F.Supp. 739 (D.N.J. 1994), invalidated Poret's testimony. *American Home* rejected inferences drawn from two studies (found to be unreliable) to be applied to a third type of advertisement. *Id.* at 749. Manley's relevant deceptive advertising appeared in just one medium: consumer packaging. *American Home* actually bolsters Aviva's position, because the court there explicitly recognized the medium-specific applicability of the studies. *Id.*

### 4. Aviva Provided Evidence That It Sustained an Injury

The District Court correctly concluded that disgorgement does not require a showing of actual confusion. A50-A51. Disgorgement under the Lanham Act "does not require adherence to the putative judge-made rule requiring actual confusion." *Masters*, 631 F.3d at 473-74. Manley has identified no authority

holding to the contrary in the false-advertising context.[10]

Manley's approach is irreconcilable with the Lanham Act's requirement that "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Manley's attempt to shift the burden of showing actual causation onto Aviva equates to shirking its statutory duty to prove the deductions from its profit disgorgement that were not caused by its wrongful conduct. In other words, the Lanham Act places the burden on Manley to prove that the profit disgorgement calculation was improper, not the other way around.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

## ON MANLEY'S APPEAL

Aviva respectfully requests that the judgment against Manley, awarding to Aviva $6.4 million in disgorgement and $2,188,931.59 in fees, costs and sanctions, be affirmed in all respects.

---

[10] Manley's reliance on *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701 (Fed. Cir. 2005) is misplaced. *Air Turbine* recognized that drawing an "inference" of causation was the applicable standard. *Id.* at 710. Here, the District Court concluded that Aviva, "has sufficient evidence of a likelihood of injury caused by Manley's allegedly false advertising." A51.

## AVIVA'S CROSS APPEAL

## SUMMARY OF ARGUMENT

The District Court erred when it granted the Retailer Defendants' motions for summary judgment on prudential standing. Add1-25. The most appropriate of the various tests for prudential standing on false-advertising claims under the Lanham Act is the Reasonable-Interest Test. The District Court failed to analyze the elements of that test as they relate to Aviva. It is also clear that the Court's decision was heavily (and incorrectly) influenced by its conclusion that the Retailer Defendants were not in competition with Aviva. Competition between the parties was a factual dispute that should have been left for the factfinder. More important, the Reasonable-Interest Test does not require a plaintiff to be in competition with the defendant in order to satisfy prudential standing requirements.

## ARGUMENT

### I.    Standard of Review.

The 8th Circuit reviews a standing determination *de novo*. *St. Paul Area Chamber of Commerce*, 439 F.3d at 484. When reviewing a grant of summary judgment, the 8th Circuit reviews findings of fact for clear error and conclusions of law *de novo*, viewing the facts in the light most favorable to the nonmoving party. *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 775 (8th Cir.2005) (citations omitted). "A question of statutory interpretation is always a question of law." *Kaufmann v. Siemens Med. Solutions USA, Inc.*, 638 F.3d 840, 846 (8th Cir.

67

2011).

## II.   The District Court Erred in Granting Summary Judgment to the Retailer Defendants on the Issue of Prudential Standing.

### A.    The Appropriate Test for Prudential Standing is the Reasonable-Interest Test.

The District Court's conclusion that Aviva lacked Lanham Act prudential

standing to sue the Retailer Defendants failed to properly apply the appropriate

test, compounded by the Court's erroneous conclusion that Aviva did not compete

against the Retailers.  The Lanham Act provides a remedy to persons "likely to be

damaged" by the unlawful conduct.  15 U.S.C. § 1125(a)(1).  With respect to false

advertising of directly competitive products by the Retailer Defendants, Aviva

clearly falls within that group.

While the 8th Circuit has yet to address the dubious notion that only

competitors have prudential standing, other courts that have recently considered

the issue have rejected a black-and-white requirement of direct competition

between parties to a false advertising claim under the Lanham Act.  "[T]he passé

semantic argument that there cannot be 'unfair competition' without 'competition'

between the parties has often been rejected."  5 J. Thomas McCarthy, *McCarthy on

Trademarks* §27:32 (4th ed. 2010).  The First, Second, and Sixth circuits have all

adopted a test for Lanham Act prudential standing that emphasizes the injuries that

the Lanham Act is meant to prevent over the business relationship of the parties.

Under that test, courts ask two questions to evaluate standing: whether the plaintiff has demonstrated "(1) a reasonable interest to be protected against the alleged false advertising and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising." *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 113 (2d Cir. 2010); *see also Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 11-12 (1st Cir. 1986); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 410-11 (6th Cir. 2012), *cert. granted* 133 S.Ct. 2766 (June 3, 2013) (No. 12-873).

The Reasonable-Interest test recalibrates the focus of the prudential standing inquiry, viewing "competition as a strong indication of why the plaintiff has a reasonable basis for believing that its interest will be damaged by the alleged false advertising" as opposed to treating competition as a *sine qua non* of standing. *Famous Horse Inc.*, 624 F.3d at 113.

## B. At a Minimum, Factual Disputes Prevent Summary Judgment.

The District Court gave short shrift to the Reasonable-Interest Test in its ruling on the Retailer Defendants' motions for summary judgment, dismissing Aviva's standing under the test "for the same reasons" that apply to the other tests. Add11.

The District Court should have concluded that Aviva had presented evidence sufficient to withstand the Retailer Defendants' motions for summary judgment.

Aviva had exhibited "a reasonable interest to be protected against the alleged false advertising." *Famous Horse Inc.*, 624 F.3d at 113. As the District Court later recognized, Manley's false advertisements had the effect of attacking Aviva's newly formed waterslide business and "smother[ing] it in its crib." A24. Manley's deception would not have been nearly as effective were it not for the forums provided by the Retailer Defendants. The Retailers took Manley's deceptive packaging and knowingly broadcast them to consumers—placing the manipulated photographs of Manley's products side-by-side with Aviva's accurately portrayed products on webpages. A3724.

Aviva presented strong evidence that Manley's advertisements affected consumers' buying patterns: two consumers directly testified that the deceptive images affected their buying decisions, and Hal Poret conducted a study demonstrating how Manley's deceptive packaging, when displayed next to Aviva's packaging, drove consumers to choose Manley over Aviva. The enormous size of the Retailer Defendants contributed mightily to this effect, as they displayed on their websites the side-by-side comparisons that deceived consumers into Manley's arms. A reasonable factfinder could conclude that Aviva has asserted a reasonable interest to be protected: its ability to compete for consumers at the retail level who accurately perceive the merits of the competing products. *Cf. Turbon Intern., Inc. v. Hewlett-Packard Co.*, 769 F.Supp.2d 262, 268 (S.D.N.Y. 2011) (recognizing a

reasonable interest in competing for consumers who are not deceived about the functionality of the competing products).

Aviva also presented strong evidence of "a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising." *Famous Horse Inc.*, 624 F.3d at 113. "The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising." *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir.1994). Aviva's belief that consumers were being deceived into choosing Manley's products over its own was more than mere speculation. The Retailer Defendants were a key link in causing Aviva's injury by knowingly taking Manley's deceptive photographs and presenting them to consumers. A factfinder could conclude that that Aviva has a reasonable basis for believing that its interests were damaged by the use of Manley advertising by the Retailer Defendants.

Even if competition between Aviva and the Retailer Defendants were required, that still presents fact issues. The record evidence shows that Aviva and the Retailer Defendants do compete to some extent, but the District Court somehow decided that they do not compete enough. The Court reasoned that "[r]egardless of whether a per se de minimis test should be adopted, the small amount of sales in this situation is not enough to allow a reasonable fact-finder to conclude that Aviva competes with Wal-Mart on the retail level." A6119.

Aviva is unaware of any 8th Circuit precedent establishing a minimum level of competition for Lanham Act standing. Moreover, even if such a standard existed, the District Court described no principled basis for determining that a reasonable factfinder would determine Aviva did not compete with the Retailer Defendants. From June 2008 to August 2010, retail sales comprised nearly seven percent of Aviva's total sales. A3468. A reasonable factfinder might very well conclude that a seven-percent share of a company's business is sufficient to establish a competitive interest.

C.   **The United States Supreme Court Will Likely Clarify the Test for Prudential Standing During the Pendency of this Appeal**.

In December 2013, the United States Supreme Court heard oral argument in *Static Control Components, Inc. v. Lexmark Int'l, Inc.*. In *Lexmark*, the Sixth Circuit affirmed the Reasonable-Interest Test.

Aviva expects that the Supreme Court will issue its opinion in *Lexmark* before this Court will release its ruling on Aviva's cross-appeal. The Supreme Court's decision in *Lexmark* will likely establish a national standard for Lanham Act prudential standing and thus impact the issues raised in this cross-appeal. Depending on when the decision is released, Aviva may be able to address it in its reply brief, or this Court may require supplemental briefing from the parties after *Lexmark* is decided.

### CONCLUSION AND STATEMENT OF RELIEF
### SOUGHT ON AVIVA'S CROSS APPEAL

Aviva respectfully requests that the District Court's judgment in favor of the

Retailer Defendants (except for Wal-Mart) on the Lanham Act claims be reversed

and that those claims be remanded to the District Court for further proceedings.

Dated: January 31, 2014                    DORSEY & WHITNEY LLP


                                   By  s/J. Thomas Vitt
                                   J. Thomas Vitt, Esq.
                                   David Y. Trevor, Esq.
                                   Michael Weinbeck, Esq.
                                   50 South Sixth Street, Suite 1500
                                   Minneapolis, MN  55402
                                   (612) 340-2600

                                   *Counsel for Plaintiff-Cross-Appellant*

# CERTIFICATE OF SERVICE

I, Susan M. Giese, hereby certify that a copy of the foregoing "Brief of Appellee Cross-Appellant Aviva Sports, Inc. in Opposition to Appellant's Brief and in Support of Cross-Appeal from the Judgment of Hon. Joan Ericksen to be filed with the clerk of the U.S. Court of Appeals for the Federal Circuit, using the CM/ECF filing system, which caused a copy to be electronically mailed to the following CM/ECF Participants noted below:

> Stephen M. Lobbin, Esq.
> The Eclipse Group LLP
> 2020 Main Street
> Suite 600
> Irvine, CA  92614
> sml@eclipsegrp.com

Dated:      February 5, 2014

_s/Susan M. Giese_____

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 15,678 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(c) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, size 14.


Dated:  January 31, 2014                    s/David Y. Trevor_____
                                            David Y. Trevor

# ADDENDUM

Order, Docket No. 407 (June 27, 2011) ……………………………….. Add. 1

Order, Docket No. 485 (Sept. 23, 2011) ……………………………….. Add. 13

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Aviva Sports, Inc.,

      Plaintiff,

v.

Fingerhut Direct Marketing, Inc., Menard, Inc.,
Kmart Corporation, Wal-Mart Stores, Inc., and
Manley Toys, Ltd.,

      Defendants.

Civil No. 09-1091 (JNE/JSM)
ORDER

---

Keith M. Sorge, Esq., Arthur, Chapman, Kettering, Smetak & Pikala, PA, appeared for Plaintiff
Aviva Sports, Inc.

Stephan J. Nickels, Esq., Foley & Lardner, appeared for Defendant Wal-Mart Stores, Inc.

Brooke D. Anthony, Esq., Anthony Ostlund Baer & Louwagie, PA, appeared for Defendant
Manley Toys, Ltd.

---

Pending before the Court is Defendant Wal-Mart Stores, Inc.'s (Wal-Mart) motion for

summary judgment on count three of the Amended Complaint, which alleges unfair competition

in violation of the Lanham Act, 15 U.S.C. § 1125(a) (2006). Wal-Mart argues that Plaintiff

Aviva Sports, Inc. (Aviva) does not have standing to bring a Lanham Act false advertising claim

against it. For the reasons stated below, the Court agrees and grants summary judgment to Wal-

Mart on count three of the Amended Complaint.

## I.   BACKGROUND[1]

Aviva manufactures and sells, among other things, inflatable waterslides and pools.

Defendant Manley Toys, Ltd. (Manley) also manufactures and sells inflatable waterslides and

---

[1]    Unless otherwise stated, the facts described below are undisputed or are those that a
reasonable fact-finder could find when viewing the record in the light most favorable to Aviva.

pools. Both Aviva's and Manley's products are available through Wal-Mart. Aviva claims that Manley's advertisements violate the Lanham Act's false advertising provision. In brief, Aviva asserts that Manley altered images of its products to make them appear larger than they actually are. According to Aviva, Manley did this by reducing the size of images of children relative to the size of its products and then inserting the scaled-down children into images of the toys to make it look like the children were using them.

Aviva outsources the manufacturing of its slides and pools and sells them, as a wholesaler, to retail stores, such as Wal-Mart. The retailers then sell the products to the ultimate consumer. A very small percentage of Aviva's sales are to consumers directly through its website. Those undisputed percentages are, from 2001 through 2010, (1) 3.71% of Aviva's total sales were retail; (2) 0.13% of Aviva's total sales were retail sales of products at issue in this case; and (3) 0.73% of Aviva's sales of products at issue in this case were retail.

Wal-Mart sells Manley's inflatable waterslides and pools in its stores and also sells them alongside Aviva's on Wal-Mart's website. Wal-Mart is not a wholesaler of the products at issue in this case.

Aviva allows the consuming public to purchase slides and pools from its website, but apart from that it points to no evidence that it attempts to compete at the retail, as opposed to the wholesale, level. For example, Aviva points to nothing suggesting it tried to improve its retail sales or take retail business away from retailers such as Wal-Mart. Aviva does, however, cite to the deposition testimony of its Federal Rule of Civil Procedure 30(b)(6) witness, Garry Bowhall, in which he testified that Aviva is in competition with some retailers.

Case: 13-1635 Case: 13-1635 Document: 32 Page: 93 Filed: 02/05/2014

## II.   DISCUSSION

In broad terms, standing is the plaintiff's right to assert a claim in court. In federal court, standing involves constitutional limitations on federal-court jurisdiction as well as prudential limits on the exercise of that jurisdiction. *Bennett v. Spear*, 520 U.S. 154, 162 (1997). To satisfy constitutional standing, which is required by Article III's limit on federal-court jurisdiction to cases or controversies, plaintiffs must demonstrate (1) that they have suffered an injury in fact; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that a favorable decision will redress the injury.[2] *Id.* In addition to these immutable requirements, federal courts have adhered to "a set of prudential principles that bear on the question of standing." *Id.* (citations omitted) (internal quotation marks omitted).

Prudential limits are concerned with the proper role of courts in a democratic society. *Id.* Unlike constitutional standing, Congress can override courts' prudential standing decisions with legislation. *Id.* As might be expected, no single rule governs every issue of prudential standing. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987). There are, however, several considerations that are typically invoked: (1) litigants may not assert the rights of third parties; (2) courts should refrain from adjudicating matters of wide public significance which amount to generalized grievances; and (3) litigants must demonstrate that their asserted interests are arguably within the zone of interests intended to be protected by the statute, rule, or constitutional provision upon which the claim is based. *Int'l Ass'n of Firefighters of Saint Louis v. City of Ferguson*, 283 F.3d 969, 973-74 (8th Cir. 2002).

---

[2]   The Court concludes that Aviva has met its burden—at the summary judgment stage—of demonstrating constitutional standing. The record contains evidence suggesting that Wal-Mart offers Manley's inflatable waterslides and pools with advertisements containing misrepresentations about the size of those products, and these misrepresentations could influence a consumer's decision to purchase Manley's products over Aviva's.

## A.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Wal-Mart suggests that because the issue before the Court is standing, as opposed to the merits, the Court may decide issues of disputed fact. (Reply 5) The Court disagrees for two reasons. First, none of the three "typical" prudential standing doctrines is at issue here. Aviva asserts its own interest, the dispute is concrete in nature, and neither party has framed the issue under the zone-of-interests test. As the Third Circuit Court of Appeals explained in *Conte Brothers Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3rd Cir. 1998), the real question is whether Congress intended parties in Aviva's position to have standing to sue parties in Wal-Mart's position. The *Conte Brothers* court called this question of prudential standing one of "statutory standing." *Id.* at 226. The Eighth Circuit Court of Appeals has distinguished between Article III standing and statutory standing in determining the appropriateness of a court deciding disputed fact issues. Unlike disputed facts that determine Article III standing, which may sometimes be decided by a court, disputed facts that determine statutory standing go "to the

merits and therefore must be decided in accordance with Rule 56 standards, viewing the evidence in the light most favorable to [the plaintiff] and leaving credibility issues to the ultimate finder of fact." *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1014 (8th Cir. 2003). The Court is not convinced that it may appropriately resolve disputed facts that bear on whether Aviva has prudential standing here. Second, resolving disputed facts would require an evidentiary hearing, which has not been conducted and which no party has requested. It would be error to "resolve[] factual disputes and ma[k]e witness credibility determinations central to the issue of standing simply by relying on a warring paper record consisting of conflicting affidavit and deposition transcripts." *United States v. 1998 BMW "I" Convertible, Vin #
WBABJ8324WEM 20855*, 235 F.3d 397, 400 (8th Cir. 2000). Accordingly, the Court declines to decide facts which have conflicting support in the record, and proceeds instead under the familiar framework of Rule 56, upon which Wal-Mart ultimately bases its motion.

**B.   Prudential standing**

Because Congress may eliminate the prudential limitations on standing, the first issue that the Court must address is whether Congress did so in passing the false advertising provision in the Lanham Act. The Court is aware of and the parties point to no Eighth Circuit case resolving this issue, but the Eighth Circuit stated in dicta that the prudential limitations on standing should apply to false advertising Lanham Act claims. *Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc. (Yellow Book)*, 434 F.3d 1100, 1103-04 (8th Cir. 2006) (dismissing Lanham Act case for failure to state a claim, but including dicta that a prudential standing requirement in false advertising cases is "without question a proper component of the 'prudential considerations defining and limiting the role of the courts'"). Every circuit that has addressed the issue has held that prudential standing limitations apply to Lanham Act false advertising

ADD5

cases. 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27.32 (4th ed. 2011) (discussing the prudential standing requirements of the Second, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuit Courts of Appeal). The *Conte Brothers* court analyzed the issue in detail based on the Lanham Act's text, structure, and legislative history and concluded that Congress had not abrogated prudential standing. The Court finds this analysis and the weight of authority on the matter persuasive and concludes that prudential limitations on standing apply to false advertising claims brought under the Lanham Act.

Although the circuits are unanimous that prudential standing limitations apply to Lanham Act false advertising claims, they articulate different frameworks to determine standing. There are three approaches: (1) a categorical test, requiring that the plaintiff and the defendant be competitors; (2) a five-factor aggregate test, first recognized in *Conte Brothers*; and (3) a reasonable interest test. In *Yellow Book*, the Eighth Circuit recognized the categorical test and the test from *Conte Brothers*, but declined to endorse one over the other because the plaintiff lacked standing under either. *Yellow Book*, 434 F.3d at 1104. The Court concludes that Aviva lacks standing under all three approaches.

*1.    The categorical test*

The Ninth Circuit, as well as the Seventh and Tenth Circuits, have restricted prudential standing for Lanham Act false advertising cases to plaintiffs that compete with defendants. 5 McCarthy, *supra*, § 27.32.

> False advertising cases generally involve some sort of misrepresentation in the marketplace that causes "a discernibly competitive injury." [*Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1106 (9th Cir. 1992)]. Standing under this line of cases requires a showing that: (1) the plaintiff competes with the defendant in some marketplace, *Halicki v. United Artists Commc['ns], Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987); (2) the plaintiff has alleged a discernibly competitive injury resulting from a misrepresentation in the marketplace, *Waits*, 978 F.2d at 1109; and (3) the misrepresentation implicates some purpose of the Lanham Act

regarding the use of trademarks. *Id.*; *see also Halicki*, 812 F.2d at 1214 (Lanham Act should not be construed to create a federal "tort of misrepresentation").

*Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d 1111, 1117 (C.D. Cal. 2003).

Wal-Mart argues that Aviva does not have standing under this test because Aviva, a wholesaler, does not compete with Wal-Mart, a retailer. Aviva responds by asserting that the record would allow a reasonable fact-finder to find that Aviva competes with Wal-Mart on the retail level. It does not. The only evidence that Aviva competes against Wal-Mart in the retail marketplace is Aviva's retail sales through its website and Bowhall's deposition testimony that Aviva competes in the retail marketplace. Aviva's retail sales make up an insignificant percentage of its total business. Aviva responds that there should be no de minimis amount of sales that prohibits a conclusion of competition. Regardless of whether a per se de minimis test should be adopted, the small amount of sales in this situation is not enough to allow a reasonable fact-finder to conclude that Aviva competes with Wal-Mart on the retail level. Aviva does not point to any evidence suggesting that it attempted to expand its retail sales or that it actively tried to take sales away from Wal-Mart (through which it sold—and apparently sells—its products) or any other retailer. Aviva also points to no evidence suggesting that it set the price of its retail products to make them competitive with retailers selling similar or even Aviva's own products. The only evidence in the record of action that Aviva took to obtain retail sales was making its products available on its website to retail consumers. In sum, Aviva's non-retail sales account for approximately 96% of its total sales; what minimal retail sales Aviva does have take place exclusively through its website; and Aviva points to no evidence of other actions or strategies to compete on the retail level. Under these circumstances, a reasonable fact-finder could not conclude that Aviva competes with Wal-Mart on the retail level. The testimony of Aviva's Rule 30(b)(6) witness does not change this analysis. Though Bowhall did testify that he considered

7
ADD7

Case: 13-1635 CASE 0:09-cv-01091-JNE-JSM Document 407 Filed 02/05/2014

retailers selling competing products to be competitors, he also testified that he considered retailers selling Aviva's products to be customers rather than competitors. (Bowhall Dep. 61) Further, Bowhall's testimony is conclusory and does not contain any underlying facts supporting his conclusion that Aviva competes with retailers. On this record, a reasonable fact-finder could not conclude that Aviva competes with Wal-Mart on the retail level. Therefore, Aviva does not have standing to sue Wal-Mart under the categorical competitor test.

    2.    *Five-factor test*

A five-factor aggregate test to determine Lanham Act standing was adopted by the Third Circuit in *Conte Brothers*:

(1) The nature of the plaintiff's alleged injury; whether it is of a type that Congress sought to redress.

(2) The directness or indirectness of the asserted injury.

(3) The proximity or remoteness of the party to the alleged injurious conduct.

(4) The speculativeness of the damages claim.

(5) The risk of duplicative damages or complexity in apportioning damages.

*Conte Bros.*, 165 F.3d at 233. Aviva fails to demonstrate standing under this test.

Aviva argues that it has established an injury of the type Congress sought to redress through the Lanham Act because it suffered lost sales. But injury to commercial interest is only one type of injury that Congress sought to redress; the other is damage to a plaintiff's ability to compete, good will, or reputation. *Conte Bros.*, 165 F.3d at 234. Aviva does not argue that the advertising here damaged its ability to compete, its reputation, or its good will. Because Aviva points to evidence supporting commercial injury without pointing to evidence of competitive injury, the first factor does not weigh in favor of its prudential standing.

Aviva's injuries are indirectly related to Wal-Mart's alleged misconduct.

> The paradigmatic case in which the directness of the plaintiff's asserted injury most clearly supports standing is one in which the defendant's "literally false advertising about its own goods influenced its customers to buy its products instead of [the plaintiff]'s product." In that scenario, the plaintiff's injury is an unmediated consequence of the defendant's anti-competitive conduct. A typical direct-injury scenario thus proceeds in three steps: (1) the defendant runs a false advertisement; (2) the advertisement causes customers to switch from purchasing the plaintiff's product to purchasing the defendant's product; (3) the plaintiff suffers economic injury as a result.

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 799 (5th Cir. 2011). Here the causal chain is more attenuated than in the paradigmatic case and is comprised of four steps instead of three: (1) Manley runs allegedly false advertisements; (2) Wal-Mart offers for sale Manley's products with the allegedly false advertisements; (3) the Manley advertisements cause the customer to purchase Manley's products instead of Aviva's; and (4) Aviva suffers an economic loss as a result. There is an intermediate step in between the initial false representation and when that representation is made to the ultimate consumer. That is, Manley makes the initial representation, which is then passed on to Wal-Mart, and then Wal-Mart passes the representation on to the consumer. And while this extra step does not occur in between the defendant's conduct and the plaintiff's injury (it is not an intervening cause), it nevertheless bears on the indirectness of the relationship between Wal-Mart's conduct and Aviva's injury; without Manley's conduct, Wal-Mart's alleged misconduct could not have occurred. The second factor does not favor Aviva's prudential standing.

Aviva is not particularly proximate to the alleged injurious conduct.

> "'[T]he existence of an identifiable class of persons'" who are more immediate to the injury than is the plaintiff and "'whose self-interest would normally motivate them to vindicate the public interest diminishes the justification for allowing a more remote party'" to bring suit. Customers are "irrelevant to this analysis" because they lack standing to sue under the Lanham Act.

*Id.* at 800-01 (citations omitted). Here, other retailers in competition with Wal-Mart are such an identifiable class. These potential plaintiffs are more proximately injured by Wal-Mart's conduct because they are at the same level in the distribution chain. Further, their self-interest, as direct retail competitors, make them more likely to vindicate the public interest. Because Wal-Mart is an Aviva customer, the litigation decisions made by a plaintiff in Aviva's position are colored by a desire to increase its business with the customer-defendant. Accordingly, this factor does not support Aviva's prudential standing.

Because Aviva's damages claim is not entirely speculative, this factor slightly supports Aviva's prudential standing. "To state a damages claim that is sufficiently determinate to support Lanham Act standing, a plaintiff must plead that the defendant's anti-competitive conduct either has caused the plaintiff to lose profits or has caused the defendant to gain profits in a definite and ascertainable amount." *Id.* at 801. As Aviva points out, the degree to which standing must be supported with evidence depends on the stage of the litigation. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1990). When this motion was argued expert discovery had not closed. In support of the definiteness of its damages claim, Aviva cites the declaration of its expert Frances M. McCloskey, who states that he will provide lost sales and profit calculations concerning the damages caused by Manley's allegedly false advertising. On the other hand, the actual economic loss depends on consumers reacting in a particular way to the advertisements of Aviva's and Manley's products. And the amount of any resulting loss will be difficult to quantify. In this sense, the damages are speculative. But on balance and at this stage of the litigation, Aviva's assertion as to what expert evidence it will adduce at trial suggests its damages are not entirely speculative and slightly supports Aviva's claim of prudential standing.

Finally, the risk of duplicative damages and complex apportionment counsels against

Aviva's prudential standing. This case presents nearly the same issues as were present in *Conte*

*Brothers*, which was a retailer-plaintiff suing a wholesaler-defendant.

> Finally, recognizing the right of every potentially injured party in the
> distribution chain to bring a private damages action would subject defendant firms
> to multiple liability for the same conduct and would result in administratively
> complex damages proceedings. Additionally, such a holding could result in an
> enormous number of relatively insignificant cases being litigated in the federal
> courts. If every retailer had a cause of action for false advertising regardless of
> the amount in controversy, regardless of any impact on the retailer's ability to
> compete, regardless of any impact on the retailer's good will or reputation, and
> regardless of the remote nature of the injury suffered, the impact on the federal
> courts could be significant.

*Conte Bros.*, 165 F.3d at 235. The final factor counsels against Aviva's prudential standing.

Aviva does not have prudential standing under the *Conte Brothers* test.

    3.   *Reasonable interest test*

A third prudential standing test, the reasonable interest test, is used by the Second Circuit

Court of Appeals.

> Our test for standing has been called the "reasonable interest" approach. Under
> this rubric, in order to establish standing under the Lanham Act, a plaintiff must
> demonstrate (1) a reasonable interest to be protected against the alleged false
> advertising and (2) a reasonable basis for believing that the interest is likely to be
> damaged by the alleged false advertising.

*Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 113 (2d Cir. 2010). For the same

reasons as have already been discussed above, the Court concludes that Aviva does not have

prudential standing under the reasonable interest test.

Accordingly, Aviva does not have standing to sue Wal-Mart under the Lanham Act

regardless of which prudential standing test is used.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Wal-Mart's Motion for Partial Summary Judgment [Docket No. 284] is
      GRANTED.

2.    Summary judgment is granted in favor of Wal-Mart and against Aviva as
      to count three, the Lanham Act claim, of the Amended Complaint.

Dated: June 27, 2011

                                         s/ Joan N. Ericksen
                                         JOAN N. ERICKSEN
                                         United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Aviva Sports, Inc.,

        Plaintiff,

v.                                                    Civil No. 09-1091 (JNE/JSM)
                                                      ORDER

Fingerhut Direct Marketing, Inc., Menard, Inc.,
Kmart Corporation, Wal-Mart Stores, Inc., and
Manley Toys, Ltd.,

        Defendants.

        Plaintiff Aviva Sports, Inc. (Aviva) brought this action against Defendants Fingerhut

Direct Marketing, Inc. (Fingerhut), Menard, Inc. (Menard), Kmart Corporation (Kmart), Wal-

Mart Stores, Inc. (Wal-Mart), and Manley Toys, Ltd. (Manley), alleging patent infringement and

false advertising in violation of the Federal Lanham Act, 15 U.S.C. § 1125(a) (2006), and the

Minnesota Uniform Deceptive Trade Practices Act (UDTPA), Minn. Stat. § 325D.44 (2010). In

an Order dated June 27, 2011, this Court granted Wal-Mart's Motion for Partial Summary

Judgment as to the Lanham Act claim (Count III of the Amended Complaint). There are

currently several motions before the Court, some of which have not yet been fully briefed or

argued. At this time, the Court only addresses Defendants Fingerhut, Menard, and Kmart's

Motion for Summary Judgment as to Counts III and IV of the Amended Complaint, which allege

violations of the Lanham Act and UDTPA. Defendants argue that Aviva lacks standing to bring

claims under either statute. For the reasons stated below, the Court agrees and grants summary

judgment to Defendants on Counts III and IV of the Amended Complaint.

1

Case: 13-1635    CASE 0:09-cv-01091-JNE-JSM    Document 485    Page: 104    Filed 02/05/2014    02/05/2014

# I.   BACKGROUND[1]

Aviva manufactures and sells, among other things, inflatable waterslides and pools. Manley also manufactures and sells inflatable waterslides and pools. Aviva's and Manley's products are both available through retailers including Fingerhut, Menard, and Kmart. Aviva claims that Manley's advertisements violate the false advertising provisions of the Federal Lanham Act and Minnesota UDTPA. According to Aviva, Manley superimposed scaled-down images of children onto images of its products to make the products appear larger than they actually are.

The defendant retailers sell the Aviva and Manley products to ultimate consumers through in-store sales, catalogs, and the internet. A very small percentage of Aviva's sales are to consumers directly through its website. Those undisputed percentages are, from 2001 through 2010, (1) 3.71% of Aviva's total sales were retail; (2) 0.13% of Aviva's total sales were retail sales of products at issue in this case; and (3) 0.73% of Aviva's sales of products at issue in this case were retail.

Defendants Fingerhut, Menard, and Kmart are not wholesalers of the products at issue. They sell Manley's and Aviva's products in their stores and on their websites. Aviva allows the consuming public to purchase slides and pools from its website, but points to no evidence that it attempts to compete at the retail, as opposed to the wholesale, level. It has not tried to improve its retail sales or take retail business away from retailers such as Fingerhut, Menard, and Kmart. Aviva again cites to the deposition testimony of its Federal Rule of Civil Procedure 30(b)(6) witness, Garry Bowhall, in which he testified that Aviva competes with some retailers and has suffered injury in the form of "lost opportunities" for sales.

---

[1] Unless otherwise stated, the facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Aviva. For the most part, the facts are the same as those recited in this Court's June 27, 2011 Order granting Defendant Wal-Mart's Motion for Partial Summary Judgment.

2

Case: 13-1635 Case: 13-1635 Document: 85 Document: 85 Page: 105 Page: 105 Filed: 02/05/2014 Filed: 02/05/2014

## II.  DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Lanham Act

In Count III of its Amended Complaint, Aviva claims that Defendants violated the Lanham Act. Specifically, Aviva alleges that Defendants engaged in unfair competition by using advertisements and packaging that contain misleading representations and/or false descriptions of the products. Defendants assert that Aviva lacks standing to bring this claim.

This Court recently reviewed an identical claim by Aviva against Wal-Mart. In its June 27 Order, this Court thoroughly detailed the federal standing requirements under the Lanham Act. Again, but briefly this time: In federal court, standing involves both constitutional and prudential limitations. *Bennett v. Spear*, 520 U.S. 154, 162 (1997). To establish constitutional standing under Article III of the United States Constitution, plaintiffs must show (1) that they have suffered an injury in fact; (2) that the injury is fairly traceable to the defendant's conduct;

3

ADD15

Case: 13-1635 Case: 13-1635 Document: 83 Document: 106 Page: 4 Filed: 02/06/2014 Filed: 02/05/2014

and (3) that a favorable decision will redress the injury.[2] *Id.* Prudential limits are concerned with the proper role of courts in a democratic society. *Id.* Generally, (1) litigants may not assert the rights of third parties; (2) courts should refrain from adjudicating matters of wide public significance which amount to generalized grievances; and (3) litigants must demonstrate that their asserted interests are arguably within the zone of interest intended to be protected by the statute, rule, or constitutional provision upon which the claim is based. *Int'l Ass'n of Firefighters of Saint Louis v. City of Ferguson*, 283 F.3d 969, 973-74 (8th Cir. 2002).

Section 43(a) of the Lanham Act provides that "any person who believes that he or she is or is likely to be damaged" may bring a civil action. 15 U.S.C. § 1125(a)(1). The Eighth Circuit Court of Appeals has stated that the prudential limitations on standing should apply to false advertising Lanham Act claims. *Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103-04 (8th Cir. 2006). While the Eighth Circuit has not yet adopted a framework from which to determine standing, other circuits have articulated three approaches: (1) a categorical test, requiring that the plaintiff and the defendant be competitors; (2) a five-factor aggregate test, first recognized in *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir. 1998); and (3) a reasonable interest test.

This Court concluded that Aviva lacked standing against Wal-Mart under all three tests. First, as a commercial wholesaler with evidence of only nominal direct consumer sales, no reasonable fact-finder could conclude that Aviva competes with Wal-Mart on the retail level. Rather, Wal-Mart is actually Aviva's customer. Thus, Aviva lacked standing under the categorical test.

---

[2] The Court has previously found that for purposes of summary judgment, Aviva met its burden of demonstrating constitutional standing against Wal-Mart. With respect to the current motion, none of the parties have challenged Aviva's constitutional standing to bring claims against these Defendants.

4

ADD16

Second, Aviva lacked standing under the five-factor test. This test considers: (1) the nature of the plaintiff's alleged injury—whether it is of a type that Congress sought to redress; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages. *Conte Bros.*, 165 F.3d at 233. The first factor weighed against prudential standing because Aviva alleged only injury to its commercial interest and not damage to its ability to compete, its reputation, or its good will. Congress sought to redress all these types of injuries. The second factor weighed against standing because Aviva's injuries were only indirectly related to Wal-Mart's alleged misconduct. The causal chain was too attenuated, because it was Manley's representations that caused the alleged injury—Wal-Mart merely passed the representations on to the ultimate consumer. The third factor weighed against standing because other retailers in competition with Wal-Mart would be more proximately injured by Wal-Mart's conduct. Those on the same level in the distribution chain would be more likely to vindicate the public interest. The fourth factor slightly supported Aviva's standing because its damages claim was not entirely speculative. Finally, the fifth factor weighed against Aviva because recognizing the right of every potentially injured party in the distribution chain to bring a claim would subject defendants to too great a risk of multiple liability and complex damages proceedings. It could also result in the flooding of federal courts with relatively insignificant cases.

Third, Aviva lacked standing under the reasonable interest test, under which a plaintiff has standing if he can demonstrate: (1) a reasonable interest to be protected against the alleged false advertising; and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising. *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 113

5

Case: 13-1635   CASE 0:09-cv-01091-JNE-JSM   Document 485   Filed 02/05/2014   Page 6 of 13

(2d Cir. 2010). If the plaintiff and defendant are not direct competitors, the plaintiff must make a "more substantial showing" of "injury and causation" to satisfy the reasonable basis prong of the standing requirement. *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994). For the reasons already discussed, Aviva lacked standing against Wal-Mart under this test.

Aviva concedes that the Court's previous analysis of standing under the Lanham Act with respect to Wal-Mart also applies to these three retail Defendants. Because there is no genuine dispute as to any material fact with respect to the Lanham Act claim, the Court grants Defendants' Motion for Summary Judgment as to Count III of the Amended Complaint.

### B. Minnesota UDTPA

In Count IV of its Amended Complaint, Aviva alleges that these Defendants violated the Minnesota UDTPA by using misleading visual images in their advertising and product packaging. Defendants argue that Aviva lacks standing to bring this claim. Under the UDTPA, "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ; or (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44, subdiv. 1. "In order to prevail in an action under [the UDTPA], a complainant need not prove competition between the parties or actual confusion or misunderstanding." § 325D.44, subdiv. 2. Section 325D.45 confers standing on any "person likely to be damaged by a deceptive trade practice of another . . . ." § 325D.45, subdiv. 1.

When interpreting any statute, courts begin with the plain language. *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). "[W]hen the statutory language is plain, we must enforce it according to its terms." *Id.* The UDTPA permits lawsuits only by "[a] person *likely to*

*be damaged*" by the defendant's conduct. § 325D.45, subdiv. 1 (emphasis added). If a party

cannot show that it is likely to be injured in the future, it cannot obtain injunctive relief under the

UDTPA. *See, e.g., Buetow v. A.L.S. Enters., Inc.*, 713 F. Supp. 2d 832, 842-43 (D. Minn. 2010)

(dismissing plaintiff's UDTPA because "there is no evidence indicating a risk of future harm to

Plaintiffs"); *Summit Recovery LLC v. Credit Card Reseller LLC*, Civil No. 08-5273, 2010 WL

1427322, at *5 (D. Minn. Apr. 9, 2010) (explaining that plaintiff was not entitled to injunctive

relief under the UDTPA because the statute "applies only to prospective damage" and plaintiff

has not "provided evidence that it is likely to be damaged by a deceptive trade practice");

*Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003) (granting

summary judgment on plaintiff's UDTPA claim because "the evidence before the court does not

indicate a likelihood of future harm"); *Lofquist v. Whitaker Buick-Jeep-Eagle, Inc.*, No. C5-01-

767, 2001 WL 1530907, at *2 (Minn. Ct. App. Dec. 4, 2001) (referring to "the statute's clear

language requiring a likelihood of future damage").

Thus, a plaintiff has standing under the UDTPA if it is likely to be injured by the

defendant's conduct. Aviva fails to meet this requirement. Aviva alleges that its injury is a "lost

opportunity" for sales—i.e. that each sale of a Manley pool by the retailers is a "lost opportunity

for Aviva to sell to that purchaser." Pl.'s Mem. Resp. Summ. J. Mot. 5-6. This is a competitive

injury. Aviva argues that it need not be a competitor to have standing under the UDTPA.

However, the cases Aviva relies upon are not cases in which a competitive injury was alleged.

*See, e.g. The Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933 (D. Minn. 2009) (allowing a

self-insured employer that paid its employees' medical expenses to bring claims against the

manufacturer of recalled cardiac devices); *Kovatovich v. K-Mart Corp.*, 88 F. Supp. 2d 975 (D.

Minn. 1999) (finding that a pharmacist had standing under the UDTPA to sue her former

employer for the continued use of her name on mail solicitations to customers after her termination). Where plaintiffs have not alleged competitive injuries, direct competition is not a requirement for standing. *See, e.g. United Healthcare Ins. Co., v. AdvancePCS*, No. Civ. 01-2320, 2002 WL 432068 (D. Minn. Mar. 18, 2002) (involving claims by non-competitors who alleged injury to their reputation and goodwill); *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490 (Minn. 1996) (recognizing that Blue Cross Blue Shield had standing to pursue its claim under section 325D.44 against tobacco companies for smoking-related injuries to its members).

Requiring competition where competitive injury is asserted comports with the plain language of section 325D.44. The section, which sets forth the elements a plaintiff must prove to succeed on a claim under the UDTPA, states that a "complainant need not prove competition between the parties." § 325D.44, subdiv. 2. The quoted language, however, refers to only to the elements of the cause of action under section 325D.44. Section 325D.45, not section 325D.44, sets forth the statutory requirements for standing. Standing under the statute requires likelihood of damage—which may or may not require competition between the parties, depending on the type of damage alleged.

Furthermore, a review of the original Uniform Deceptive Trade Practices Act sheds light on the meaning of this statutory language. Minnesota's UDTPA is an adoption of the Revised Uniform Deceptive Trade Practices Act, drafted by the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association. The Minnesota legislature intended that it be "applied and construed as to effectuate its general purpose to make uniform the law . . . among those states which enact it." Minn. Stat. § 325D.47. Thus, it is appropriate to examine the original Uniform Act along with its prefatory notes and comments.

8

ADD20

Case: 13-1635 Case: PARTICIPANTS ONLY Document: 11 82 Filed: 02/05/2014ed: 02/05/2014

The authors of the Uniform Act commented that the subsection stating "a complainant need not prove competition between the parties or actual confusion or misunderstanding" was designed to "remove[] the enumerated factors as absolute bars to relief." Revised Unif. Deceptive Trade Practices Act § 2(b) cmt. at 15 (1966). The authors cited *Academy of Motion Picture Arts & Sciences v. Benson*, 15 Cal. 2d 685 (1940), in support of the principle that "actual competition between the parties is not a prerequisite of relief." *Academy of Motion Picture Arts & Sciences* involved what is now known as "false association." In that case, the defendant induced students to enroll in her acting school by making them believe her school was associated with the plaintiff's organization. The California trial court sustained the defendant's demurrer to the complaint without leave to amend. On appeal, the court acknowledged that the "businesses of the parties are not directly competitive, although both are connected with the motion picture industry." *Id.* at 688. It held that to plead a proper complaint for "the deceptive and injurious use of what may be designated as a trade name," it was not necessary that the parties be in direct competitive business. *Id.* at 690. It was sufficient that "the names, although not identical, are sufficiently similar to cause confusion and injury." *Id.* at 692.

The comment accompanying the Uniform Act illustrates that in certain contexts, a plaintiff does not have to prove actual competition as an element of the cause of action. This is especially true in the context of "passing off," "false association," or misuse of trade names or trademarks, where a non-competitor's business, reputation or good will can be injured. The comment does not support the conclusion that in the context of an alleged competitive injury, a complainant need not prove competition. Nor does the comment deal with the Act's requirements for standing.

9

ADD21

Case: 13-1635 CASE-PARTICIPANTS ONLY Document: 85 Page: 112 Filed: 02/03/2014 Filed: 02/05/2014

Thus, because of the *type* of injury Aviva alleges—a competitive injury—Aviva only has standing under the UDTPA if it can show it competes with these retail Defendants. Aviva has not done so. The only evidence Aviva offers of competition is the deposition of Mr. Bowhall, in which he testified that Aviva competes with some retailers and has suffered injury in the form of "lost opportunities" for sales. This Court already held that Mr. Bowhall's testimony is conclusory and unsupported by facts. Aviva has made no attempt to provide any additional evidence to demonstrate that it competes, or even attempts to compete, with these retail Defendants.

Moreover, Minnesota courts have noted that the UDTPA generally mirrors the Federal Lanham Act and that claims under both statutes are analyzed in essentially the same way. *See Grp. Health Plan, Inc. v. Philip Morris Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999) ("Plaintiffs' claim for deceptive trade practices is governed by Minnesota Statute § 325D.44, which requires the same analysis as the federal Lanham Act."); *Med. Graphics Corp. v. Sensormedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994) ("Minnesota federal district courts have found that 'the Minnesota Deceptive Trade Practices Act mirrors the Lanham Act' and thus use the same analysis to evaluate false advertising claims that are made simultaneously under the federal and state statutes."); *Multi-Tech Sys., Inc. v. Hayes Microcomputer Prods., Inc.*, 800 F. Supp. 825, 847 (D. Minn. 1992) ("The Minnesota Deceptive Trade Practices Act covers false advertising and plaintiffs typically assert claims under that Act in conjunction with the Lanham Act, 15 U.S.C. § 1125(a). Thus, the Minnesota [DTPA] mirrors the Lanham Act."); *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1137 (D. Minn. 1981) (in the context of trademark infringement claims, "[t]he claim under the Minnesota [DTPA] is substantially the same as the federal claims").

ADD22

The similarity between the statutory grants of authority to bring suit under the Lanham Act and the UDTPA reflect this "mirroring." The Lanham Act provides that "any person who believes that he or she is or is likely to be damaged" may bring a civil action. 15 U.S.C. § 1125(a)(1). The UDTPA permits lawsuits by "[a] person likely to be damaged by a deceptive trade practice of another." Minn. Stat. § 325D.45, subdiv. 1. This parallel language strongly suggests that the requirements for standing under the UDTPA are the same as those under the Lanham Act. In fact, when discussing the Uniform Act provision regarding standing, the National Conference of Commissioners on Uniform State Laws commented that "[s]imilar phraseology determines standing to sue under Section 43(a) of the Lanham Trademark Act." Revised Unif. Deceptive Trade Practices Act § 3 cmt. at 16 (1966). Thus, the drafters explicitly incorporated the Lanham Act's language regarding standing.

Aviva argues that analysis under the UDTPA cannot be the same as under the Lanham Act because the UDTPA specifically states that "a complainant need not prove competition between the parties." § 325D.44, subdiv. 2. In contrast, some circuit courts have held that a claimant *must* be a competitor in order to have standing under the Lanham Act.[3] *See, e.g., Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005) (holding that plaintiffs lacked standing under the Lanham Act's "false advertising" prong because they were not competitors and did not suffer competitive injuries); *Telecom Int'l Am.*,

---

[3] There might or might not be a conflict between the Uniform Act and the Lanham Act with regard to standing for ultimate consumers. *See, e.g., Conte Bros.*, 165 F.3d at 229 (explaining that the Lanham Act's "focus . . . is on anticompetitive conduct in a commercial context" and that consumers "hav[e] no competitive or commercial interests affected by the conduct at issue"); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63 (Del. 1993) (finding that a plaintiff has standing under Delaware's UDTPA only if there is some "horizontal business or trade interest at stake"). In Minnesota, there is a private attorney general statute. Minn. Stat. § 8.31, subdiv. 3a. This statute, however, does not apply to the UDTPA. *See State by Humphrey*, 551 N.W.2d at 496 (explaining that standing to bring suit under some consumer protection statutes is found in the private attorney general statute, but the UDTPA "contains its own legislative grant of standing and, thus, requires no reference to Minn. Stat. § 8.31"). In some instances, consumers have been allowed to sue under Minnesota's version of the UDTPA. *See id.* at 495 (allowing Blue Cross Blue Shield to bring a claim against tobacco companies for injuries to its members). However, this case does not involve a consumer plaintiff.

ADD23

Case: 13-1635 CASE 0:09-cv-01091-JNE-JSM Document 485 Filed 09/23/11 Page 12 of 13  Filed: 02/05/2014

*Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) ("[T]o have standing for a [Lanham Act] false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." (quoting *Stanfield v. Osborne, Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995))); *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 438 (7th Cir. 1999) ("A party bringing suit must assert 'a discernible competitive injury.'" (citation omitted)). Thus, Aviva argues, to require that a plaintiff be a competitor would contradict the plain language of the UDTPA.

Aviva's argument has merit to the extent that the "categorical test" for standing under the Lanham Act, which absolutely requires that the parties be direct competitors, is not applicable under the UDTPA. However, as this Court has already noted, Aviva is only required to be Defendants' competitor because of the specific type of injury Aviva alleges—a competitive injury. Additionally, Aviva cannot establish standing under either of the other two Lanham Act tests—the five-factor test from *Conte Bros.* or the reasonable interest test. Neither test makes the lack of direct competition an absolute bar to relief—it is only a factor to consider in the analysis. Application of these tests does not contradict the UDTPA's plain language. Just as the five-factor test and reasonable interest test resulted in Aviva having no standing against Wal-Mart, the same conclusion must be reached with respect to Fingerhut, Menard, and Kmart. Aviva agrees that these three Defendants are in no different position than Wal-Mart. Thus, Aviva lacks standing under either test to bring a claim against Fingerhut, Menard, or Kmart.

Aviva also argues that this Court should broadly construe the statute "to enhance consumer protection" and that "aggressive prosecution of deceptive trade practices is good for Minnesota consumers." While there is a "clear legislative policy encouraging aggressive prosecution of statutory violations," *State by Humphrey*, 551 N.W.2d at 495, "[a]ggressive

12

ADD24

prosecution does not mean that we are permitted to misconstrue or expand those remedies provided by the legislature." *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999). The statute explicitly provides a remedy only for those "likely to be damaged." Aviva does not meet this requirement.

After considering Minnesota courts' analysis of the UDTPA and the commentary accompanying the Uniform Act from which the UDTPA was derived, this Court concludes that Aviva lacks standing to bring this UDTPA claim against these Defendants. As previously stated, here and in the June 27 Order, Aviva has not pointed to any evidence that it competes in the retail market for the products at issue. Absent competition, Aviva is not likely to suffer a competitive injury. Therefore, there is no genuine issue as to any material fact. Defendants' Motion for Summary Judgment on Count IV of the Amended Complaint is granted.

## III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 418] is GRANTED IN PART.

2. Summary judgment is granted in favor of Defendants Fingerhut, Menard, and Kmart and against Aviva as to Count Three, the Lanham Act claim, and Count Four, the Minnesota UDTPA claim, of the Amended Complaint.

Dated: September 23, 2011

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

13

ADD25